[No. 7,153.—In Bank.]

## JACOB ROSENBERG ET AL. *v.* ELISE FRANK ET AL.

ACTION TO CONSTRUE WILL—JURISDICTION OF DISTRICT COURT—EQUITY JURISDICTION—CONSTRUCTION OF CONSTITUTION.—Section 6, article vi of the Old Constitution conferred upon the District Courts the same jurisdiction in equity as that administered by the High Court of Chancery in England; and consequently the former Court had jurisdiction of an action to construe the will of a testator after the same had been admitted to probate.

CONSTRUCTION OF WILL—BEQUESTS—IDEM SONANS—MISTAKE IN SPELLING—PRO RATA—DEFINITION.—A testator bequeathed to three sisters, of the full blood, one hundred thousand dollars each, and to two sisters of the half blood, fifty thousand dollars each, and to a trustee in trust for three children of a deceased sister of the full blood one hundred and fifty thousand dollars, and after other bequests, bequeathed the residue of his estate to be divided *pro rata* between his sisters and the children of his deceased sister above mentioned (naming them).

*Held,* That the words "*pro rata*" were evidently intended to be "*pro rata;*" and implied that the distribution was to be made in accordance with some rate previously indicated; that the sums mentioned in the first bequests furnished the rate or proportion referred to, and that the residuum should be distributed between the several legatees therein named in the proportion existing between special bequests to them.

ID.—RULES OF CONSTRUCTION.—Certain rules of construction referred to.

Id.—Precedence.—Except for the establishment of general principles very little aid can be procured from adjudged cases in the construction of wills. It seldom happens that two cases can be found precisely alike.

Appeal from a judgment for the plaintiffs and from an order denying a new trial, in the Fourth District Court, City and County of San Francisco. Morrison, J.

A petition for rehearing was filed in this case after the decision in Bank, and denied.

*Cope & Boyd* and *J. M. Taylor*, for Executors.

*Wilson & Wilson*, for certain Respondents.

*McAllister & Bergin*, for certain Appellants.

No objection to the jurisdiction has been raised by any of the counsel engaged in the case. On the contrary, the parties are united in desiring a speedy construction of the will. The importance of the matter is evident; and the existence of the jurisdiction has already been recognized by the Court. (*Payne* v. *Payne*, 18 Cal. 292.) The Constitution in force at the time of the commencement of this action gave to the District Courts jurisdiction " in all cases in equity." The jurisdiction of Courts of Equity in matters of trust is elementary learning, and as incidental to their jurisdiction in that respect, they constantly entertain suits by executors and trustees for the construction of wills and other instruments. (*Bailey* v. *Briggs*, 56 N. Y. 413; *Chipman* v. *Montgomery*, 63 id. 230; *Bowers* v. *Smith*, 10 Paige, 201; *Crosby* v. *Mason*, 32 Conn. 482; *Clark* v. *Clark*, 17 Ga. 485; *Kiah* v. *Grenier*, 56 N. Y. 220; *White* v. *Fisk*, 22 Conn. 31; *Heartt* v. *Livingston*, 14 Hun, 285; *Haggerty* v. *Lanterman*, 30 N. J. Eq. 37.)

*Jarboe & Harrison*, for Appellants Therese Weinman and Lena Cohn.

The intention of the testator is to be reached by determining the meaning of the words he has used. This meaning is to be ascertained from the will itself. (*Colt* v. *Colt*, 32 Conn. 446; *Sams* v. *Garlick*, 14 Mee. & W. 701; *Grey* v. *Pearson*, 6 H. L. C. 106; *Myres* v. *Myres*, 23 How. Pr. 413; *Bullock* v.

*Downes,* 9 H. L. C. 24; *Pickering* v. *Langdon,* 22 Me. 429;
1 Redfield on Wills, 465; *Compton* v. *Compton,* 9 East, 267;
*Crutchfield* v. *Pearce,* 1 Price, 364; *Chapman* v. *Brown,* 3
Brown's P. C. 269.) In construing the residuary clause
of a will that is independent of any other clause, the
Court is limited to the words found in that clause, if by
any rational construction of them, the intention of the tes-
tator can be ascertained. (Civ. Code, § 1322; *Compton*
v. *Compton,* 9 East, 267; *Campbell* v. *Harding,* 2 Russ. &
M. 410; *Colt* v. *Colt,* 32 Conn. 450; Civ. Code, § 1323.)
Where there is no connection in grammatical construction, or
by direct words of reference, or the declaration of some com-
mon purpose between distinct devises in a will, the special
terms of one devise can not be drawn in aid of the construc-
tion of another, although, in its general terms and import,
similar, and applicable to persons standing in the same de-
gree of relationship to the testator, and there being no appar-
ent reason other than the different wording of the clauses
to presume that the testator had a different purpose in
view. (1 Redfield on Wills, 461; Civ. Code, § 1322; 2
Williams on Executors [1083]; *Compton* v. *Compton,* 9 East,
267; *Pratt* v. *Leadbetter,* 38 Me. 13.) Examining this will
in view of the foregoing rules, we submit that the Court
was not authorized in holding that the residuary clause was
in any respect dependent upon or to be construed by the
terms of the legacy clauses. Such construction incorporates
into the will words which the testator has not himself used,
and which are also unnecessary to the construction of the
words which he has used. It assumes, also, and that, too,
only by conjecture, that the testator has intended to pre-
serve, in his disposition of the residue of the estate, the
same proportion which the legacies given by the testator
in the first two clauses of the will bear to each other. It
denies any effect to be given to the fact that the testator has,
in his residuary clause, *ex industria,* made "the children of
Mary Fuller, deceased," the recipients of his bounty, rather
than "Jacob Rosenberg in trust for" these children. It de-
nies any effect to be given to the fact that in this clause the
testator for the first time introduces into his will the name of
"Mary Fuller"—and mentions her in connection with his

other sisters—thereby indicating that the division was to be
into sisters' shares.  If, in the interim between the making
of the will and the death of the testator, two of the nieces
had died, the bequest of one hundred and fifty thousand
dollars to "Jacob Rosenberg in trust" would still have re-
mained, but the disposition of the "surplus" would have been
limited to six individuals instead of eight.  It would be vio-
lating all legitimate presumptions, whether deduced from the
ties of blood or the universal experience of mankind, to sup-
pose, in the absence of any indications in the will to that effect,
that Mr. Reese could have intended that under any circum-
stances a niece should receive a greater share of his estate
than either of his sisters.  Yet upon the construction given
by the Court below, if, at the death of Mr. Reese there had
been only one surviving niece, a division of his estate "in the
same proportion as the special pecuniary legacies given them
in a previous part of said will," would entitle that surviving
niece to receive three elevenths of the entire residue of his
estate.  (*Hoppock* v. *Tucker*, 59 N. Y. 202; *Ashling* v. *Knowles*,
3 Drew. 593; *Jackson* v. *Roberts*, 14 Gray, 546; *Bolles* v. *Smith*,
39 Conn. 217.)  No argument can be drawn from the fact
that some of the sisters are of the whole blood and some of
the half blood.  (1 Redf. on Wills, 430; *Walker* v. *Tipping*,
9 Hare, 807.)  But the words "*pro rata*," being in the clause,
must be considered as having some significance, and as having
been used by the testator for some purpose.  He has de-
clared that the "balance" is to be divided between his
"sisters" and "the children of Mary Fuller, deceased."  In
the absence of any controlling words the use of the word
"between" would signify that the division was to be into two
amounts.  But if it be conceded that "between" in this clause
is equivalent to "among," then, in the absence of other con-
trolling words, the division would be "among" all the benefi-
ciaries *per capita*.  The very fact, however, that he has speci-
fied that the division is to be *pro rata*, shows that he did not
intend it to be equal.  Now, in order to find the rule, the
proportion which is fixed—*rata*—established—if we look to
the Statute of Distribution, we shall there find the very pro-
portion which will satisfy all of the conditions and require-
ments of this clause.  As every will is supposed to be drawn

in contemplation of the law of distribution, we must suppose that the testator had the Statute of Descents in his mind when he penned this clause, and that he used the words *pro rata* to indicate the rule fixed by the statute for dividing his estate; as if he had said: "The balance to be divided between my living sisters and the children of my deceased sister, in the proportion fixed by law." "The Statute of Distribution governs in all cases where there is no will, and where there is one, and the testator's intention is in doubt, the statute is a safe guide" (p. 225). (*Clark* v. *Lynch*, 46 Barb. 81; *Lyon* v. *Acker*, 33 Conn. 222; *Talcott* v. *Talcott*, 39 id. 186; *Raymond* v. *Hillhouse*, 45 id. 474; *Fissel's Appeal*, 27 Pa. 58; *Minter's Appeal*, 40 Pa. St. 111; *Risk's Appeal*, 52 id. 269; *France's Estate*, 75 id. 225; *Denn* v. *Mellor*, 5 T. R. 564; *Lynes* v. *Townsend*, 33 N. Y. 562; 2 Williams on Executors [1088], note; *Daggett* v. *Slack*, 8 Metc. 453.)

*S. M. Wilson*, for certain Respondents.

We insist that the intention of Mr. Reese was to give these residuary legatees the residue of his estate in the same proportion in which he had given them the previous specific pecuniary legacies; that is to say, that each sister of the whole blood shall take twice as much as a half sister or a niece. (Civ. Code, §§ 1317-19, 1321-5, 1338, 1376; *Hall* v. *Warren*, 9 H. L. C. 427; *Young* v. *Robertson*, 4 Macq. H. L. C. 314, 325; S. C., 8 Jur., N. S., 825; *Kean's Lessees* v. *Hoffecker*, 2 Harr. 115; S. C., 29 Am. Dec. 336; 1 Redf. on Wills, 429, notes. Nothing in this will indicates that the words "pro rata" are intended in any other than their ordinary and grammatical sense, and the inquiry remains as to what is the ordinary and grammatical sense of the expression "*pro rata.*" Applied to a sum to be divided, it means division ratable and proportionably to some other fixed and ascertained sums. For example: Eight persons are to be the recipients of a given sum. In what parts shall it be divided? If "equally," eight is the divisor, and divides into the aggregate dividend or amount to be divided, and the product is the share of each, without referring to any other sums to ascertain the personal share. So "share and share alike" only requires in like manner simple division of the sum to be divided

by the number of recipients. But the moment we say "in proportion," or "proportionably," or "ratably," or "*pro rata,*" we introduce new elements in the calculation and adjustment. The words *pro rata* have a legal definition, and have universally received but one interpretation, not only by the Supreme Court of California and by the California Legislature, but by Congress, the Supreme Court of the United States, and the Supreme Courts of the other States throughout the Union, as well as in England, as will be seen by reference to the following cases, statutes, and authors, where the interpretation we contend for is adopted. (*Adams* v. *Haskell,* 6 Cal. 116; *Adams* v. *Hackett,* 7 id. 187; *Adams* v. *Woods,* 8 id. 155; S. C., id. 311; *Naglee* v. *Minturn,* id. 540, 541, 543, 544; *Adams* v. *Woods,* 9 id. 24–27, 30; *Speyer* v. *Ihmels,* 21 id. 286, 288; *Tibbitts* v. *Moore,* 23 id. 212; *Myers* v. *Mott,* 29 id. 373; *Wheeler* v. *Farmer,* 38 id. 205; *Parker* v. *Page,* id. 524; *Prince* v. *Lynch,* id. 533; *Bergson* v. *Builders' Ins. Co.,* id. 547; *City and County* v. *S. V. W. W.,* 39 id. 473; *Fishbeck* v. *Phenix Ins. Co.,* 54 id. 426, opinion by Mr. Justice Myrick; *Curtis* v. *Parks,* 55 Cal. 106; *Bustamente* v. *Stewart,* 55 id. 115; § 1648 Code Civ. Proc. uses the words *pro rata;* "An Act to Protect the Wages of Labor," Stat. Cal. 213, 214; Insolvent Act of 1880, § 31; Cowdery's Law of Insolvency, 45; Rev. Stats. U. S., § 5091; Bump on Bankruptcy, 573, 7th ed.; *In re Owen Byrne,* 1 B. Reg. 464; *In re Erwin & Hardee,* 3 B. Reg. 580; *In re McConnell,* 9 id. 387–394; *In re Downing,* 1 Dill. 33; 5 U. S. Stat. at Large, 444, § 5; id. 447, § 10; 10 id. 304; 14 id. 529, § 27; *Smith* v. *Kehr,* 7 B. Reg. 97; *Harrison* v. *McLaren,* 10 id. 248; *Adams* v. *Meyer,* 8 id. 216; *In re John King,* 9 id. 140; *In re Haynes,* 2 id. 227; *Austin* v. *O'Rielly,* 8 id. 131; *Pollard* v. *Bailey,* 20 id. 527; *Hurtin* v. *Union Ins. Co.,* 1 Wash. C. C. 531; *Caze* v. *Balt. Ins. Co.,* 7 Cranch, 362; *Baillie* v. *Modigliani,* 6 T. R. 421; *Ship N. Hooper,* 3 Sumn. 549, 551, 555, 556; *Dunham* v. *R. R. Co.,* 1 Wall. 268, 269; *Buchanon* v. *Upshaw,* 1 How. U. S. 69, the Court says "apportioned," and the syllabus "*pro rata;*" same in case *Washington Bank* v. *Prescott,* 20 Pick. 339; *United States* v. *Kansas P. R. R. Co.,* 99 U. S. 458; *Myrick* v. *Thompson,* id. 291; *In re Hoyt,* 3 Biss. 440; *United States* v. *Dickson,* 15 Pet. 150; see also *United States*

v. *Wardwell,* 5 Mason, 86, where Judge Story uses *pro rata* five times on one page; *In re London I. R. Co.,* 5 L. R., Eq. Cas., 526, 527; *Kennedy* v. *Creswell,* 101 U. S. 641; *Mason's Appeal,* 89 Penn. 402; *Morris* v. *Morris,* 9 Heisk. 814; *Williston* v. *Mich. S. R. Co.,* 13 Allen, 400; *Cunningham* v. *Vt. & M. R. R. Co.,* 12 Gray, 411; *Barnard* v. *Vt. & M. R. R. Co.,* 7 Allen, 512; *Taylor* v. *Stevens,* 7 How. Pr. 415; *Brinham* v. *Wellersburg Co.,* 47 Pa. St. 51; *Robinson's Estate,* 88 Penn. 422; *Mulvey* v. *Johnson,* 90 Ill. 457; *Aldrich* v. *Cooper,* Lead. Cas. Eq., White & Tudor, vol. 2, part 1, 244; ·*German Bank* v. *Jefferson,* 10 Bush, 326; *Robinson* v. *Stewart,* 10 N. Y. 196; *Norton* v. *Norton,* 5 Cush. 530; see Lead. Cas. Eq., White & Tudor, vol. 2, part 1,.412; *Eastman* v. *Foster,* 8 Mctc. 28; *Boyd* v. *Hall,* 56 Ga. 563; *Yearnshaw's Appeal,* 25 Wisc. 22; *Umsted* v. *Buskirk,* 17 Ohio St. 117; *Robinson* v. *Marine I. Co.,* 2 Johns. 325; *Coffin* v. *Storer,* 5 Mass. 256; S. C., 4 Am. Dec. 54; *Welch.* v. *Hicks,* 6 Cow. 509; S. C., 16 Am. Dec. 441; *Whitney* v. *N. Y. I. Co.,* 18 Johns. 212; *Mulloy* v. *Backer,* 5 East, 316; *Richardson* v. *Young,* 38 Pa. St. 174; *Lampson* v. *Arnold,* 19 Iowa, 486; *Lockhart* v. *White,* 18 Tex. 109; *Burnap* v. *Haskins S. E. Co.,* 127 Mass. 590; *Wakeman* v. *Grover,* 4 Paige Ch. 39; *Lippincott* v. *Barker,* 2 Binney, 174; S. C., 4 Am. Dec. 433; *People* v. *Security L. I. Co.,* 78 N. Y. 121; *Kramer's Appeal,* 37 Penn. 73–75, 80, 81; *Smuller* v. *Union C. Co.,* id. 69; *Goodman* v. *Pocock,* 15 Queen's B. 576–581; *Vlierboom* v. *Chapman,* 13 Mee. & W. 229; see, particularly, *Manice* v. *Manice,* 1 Lans. 352, 353, where "*pro rata*" is used three times in a will; see, also, the following works: Thompson on Liability of Stockholders, §§ 18,53, 69; Bigelow on Estoppel, 595; Abbott's Law Dict., vol. 2, word " *Pro Rata;*" Hilliard on Bankruptcy, 217; Jones on R. R. Securities, §§ 637, 638; Munger on the Application of Payments by Debtor to Creditor, 57, 78,184, 212; Story's Eq. Pl., 7th ed. Redfield's, 123, 129, §§ 119, 127.)

Having ascertained the ordinary and grammatical sense of "*pro rata,*" and the division being ordered to be made "*pro rata,*" ratably and by proportion, we must look inside of the will for the members of the proportion, and be able to state it algebraically. The construction is to be on the whole instrument—" *nam-ex antecedentibus et consequentibus fit op-*

*tima interpretatio.*" (2 Bl. Com. 379.) We confidently submit that the meaning of the will is the same as if Mr. Reese had proceeded to give the specified legacies to his sisters and nieces as he did, and then had said, the residue I give to the same persons *pro rata,* first deducting the amount necessary to pay my debts and the following small legacies and charities, and had recited these at the end. But the bringing of the residuary clause close up to the specific legacies only makes it more apparent.

*J. P. Hoge* and *Flournoy & Mhoon,* for certain Appellants, on petition for rehearing.

The Court, in construing the residuary clause, confines itself to the verbiage of the first and residuary clauses. There are reasons springing from the nature of the estate, imposed by the will upon the legacy to Rosenberg of one hundred and fifty thousand dollars in the first clause, which make the first clause of the will inapplicable as controlling the residuary clause. On the proposition that a joint tenancy is created in the *cestuis qui trustent* by the language of the will, we refer to Jarman on Wills, vol. 2, 9; *Griswold* v. *Johnson,* 5 Conn. 363; *Whiting* v. *Cook,* 8 Allen, 63; *Emerson* v. *Cutler,* 14 Pick. 108; *Dunn* v. *Bryan,* 38 Ga. 154; *Westcott* v. *Cady,* 5 Johns. Ch. 334; S. C., 9 Am. Dec. 306; *Dickson* v. *Dickson,* 70 N. C. 487. That survivorship follows, and that the incidents of such joint tenancy are, that if the gift fails as to one of the beneficiaries, or is subsequently revoked, or one dies during the life of the testator, or one dies after the testator and before distribution or division, the others will take the whole. We refer to Jarman on Wills, vol. 1, 340; id., vol. 2, 155; id., vol. 3, 17; *Stephens* v. *Milnor,* 9 C. E. Green (N. J.), 358; *De Camp* v. *Hall,* 42 Vt. 483; *Dow* v. *Doyle,* 103 Mass. 489; *Bolles* v. *Smith,* 39 Conn. 219. If this view be correct, the quality of estate taken by the applicants herein, in the first clause of the will, is so entirely different from the direct legacy in the residuary clause, that one can not be invoked to explain, qualify, or control the other in any respect; and it is most clear, that as between the *eight* persons named in the first clause (or rather nine persons, including Rosenberg), their estates differ so es-

sentially in quality as to render an intelligent statement of a proportion between them, impossible.

THORNTON, J.:

Michael Reese died on the 2d of August, 1878, leaving a last will and testament, of which the following is a copy:

"I Michael Reese being of sound mind, and memory, do make, ordain, publish and declare this to be my last will and testament, the whole written wits my own hand. I direct all my just debts to be paid with as little delay as possible. I direct the rest of my property to be converted into cash within five years after my death by my executers hereinafter named, and to be divided as follows, To my sisters Eliese Frank, Henerietta Rosenfeld, Hanna Rosenberg, all of the City Chicago, State of Illonois one hundred thousand dollars *each* to my sisters Therese Weinman, and Lena Cohn of the same place aforesaid fifty thousand dollars each. To Jakob Rosenberg of the City of Chicago State of Illonois in trust for Hanah Goldsmith Carry Manheimer, and Rosa Fuller one hundred and fifty thousand dollars. To Joseph Frank and H. L. Frank my nephews sixty thousand dollars or thirty thousand to *each* and I direct that forty thousand dollars owing by them to me be marked paid and cancelled. To my niece Nancy Frank daughter of my sister Eliese Frank twenty-five thousand dollars To H. L. Frank in trust for his sister Mina Friedlander and her children twenty-five thousand dollars. To Regina Goodman of the City of New York widow of H. Goodman deceased ten thousand dollar— To Dr. John N. Eikel in trust for his son Charles Eikel five thousand dollars. To Caroline Greeneberg, wife of Leopold Greeneberg of this city twenty five hundred dollars. To Leonardt Weglehuer at present in my employment twenty five hundred dollars, To the Pacific Hebrew Orphan Asylum and Home Society twenty thousand dollars, To the Saint Lukes Hospital also of this city ten thousand dollars To the Mount Sinai Hospital of the City of New York twenty five thousand dollars To the Hebrew Orphan Asylum of the City of New York twenty five thousand dollars. I give and devise to the Corporation known as the Regents of the University of California Fifty thousand dollars to be by them

invested in the founding and maintaining a Library to be known and called the Reese Library of the University of California. To Jakob Rosenberg and my dear sister Henerietta Rosenfeld of the City Chicago State of Illonois two hundred thousand dollars ($200,000) in trust to be disbursed by them in such charities as they may think fit. I would recomend to them that a part of the above named amount should be disbursed amongst my first cousins living in *Bavaria* Germany, and any other country where they may reside provided they are poor and needy, and part of the same should be invested in some charity, regardless of Creed in my birthplace Hainsfurth Kinkdom Bavaria Germany. I schall leave this to their own judgment and discretion to *disburse it.* Wisching to schow my extreme regard for my Friend Mrs. R. C. Johnson, of this city, who positively refuses to be one of my legatees, I leave in trust to her for certain favorite charities for instance A Home, or Asylum for aged people regardless of Creed, and the San Francisco Foundling and lying in Hospital, thirty thousand dollars to be disbursed by her for the above named charities I, desire that my Executers hereinafter named schall aid and advise her, and render her all assistance, To the Eureka Benevolent Society of this City twenty thousand dollars  To the German Hospital of this city ten thousand dollars,  To my Nephews H. L. Frank and Joseph Frank in trust for a Orphan Asylum in Cleveland Ohio and other charities in Chicago which I, omitted. Fifty thousand dollars which they can use and disburse as they may think fit. If there is any surplus after paying my Legacies and Debts the Ballance to be divided pro rato between my sisters Eliese Frank, Henerietta Rosenfeld, Hana Rosenberg and Therese Weineman. Lena Cohn and the children of Mary Fuller deceased namely, Hana Goldsmith Carry Manheimer and Rosa Fuller,—I, appoint as my executers Charles Lux and Joseph Rosenberg of this city and Jakob Rosenberg of the city of Chicago State of Illonois and I, direct that no bonds be required of them or either of them. In witness whereof I, have hereunto set my Hand in the presence of three Witnesses whom I, requested to act as subscribing hereto and in their presence and in the presence of each of them I, have declared this to be my last will and testament

on this fourteenth day of March in the year one thousand eight hundred and seventy-eight.    MICHAEL REESE.

"On this fourteenth day of March, A. D. eighteen hundred and seventy-eight we, the undersigned all residing in the city of San Francisco State of California have hereunto set our hands as subscribing witnesses to this the last will and testament of Michael Reese at the request of said Reese in his presence and in the presence of each of us.

> "WILLIAM ALVORD,
> "H. M. NEWHALL,
> "G. PALACHE."

On the fifth of September, 1878, this paper was duly admitted to probate as the last will and testament of the decedent Reese, by the Probate Court of the County of San Mateo. The plaintiffs were by the same Court appointed executors of the said will; letters testamentary were issued to them, and they qualified and entered upon the discharge of their duties as such executors.

The executors bring this action to obtain a construction of the will.

It will be perceived on a perusal of the will, which is autographic, that the testator, after a direction that all his just debts shall be paid with as little delay as possible and that the rest of his property shall be converted into cash by his executors within five years after his death, preceeds to give direction as to the division of the proceeds. The first bequests are as follows:

"To my sisters Eliese Frank, Henerietta Rosenfeld, Hanna Rosenburg, all of the City Chicago State of Illonois one hundred thousand dollars *each* to my sisters Therese Weinman and Lena Cohn of same place aforesaid fifty thousand dollars each. To Jakob Rosenberg of the City of Chicago State of Illonois in trust for Hanah Goldsmith, Carry Manheimer, and Rosa Fuller one hundred and fifty thousand dollars."

Several bequests follow, expressed in seventeen different clauses, after which the testator thus disposes of the residuum of his estate: "If there is any surplus after paying my Legacies and Debts the Ballance to be divided pro rato between

my sisters Eliese Frank, Henerietta Rosenfeld, Hanna Rosenburg, and Therese Weineman, Lena Cohn and the Children of Mary Fuller deceased namely, Hana Goldsmith, Carry Manheimer and Rosa Fuller."

The construction of the residuary clause just above quoted, is asked in the complaint in this action. It is contended on behalf of Eliese Frank, Henerietta Rosenfeld, and Hannah Rosenberg, who are sisters of the whole blood, that according to the true meaning of this residuary clause, the residuum is to be distributed under it between the several legatees therein named, in the same proportion as the special pecuniary legacies are given to them in the clause of the will first above quoted herein, and that they are each entitled to two elevenths and the others one eleventh each. Therese Weinman and Lena Cohn, who are sisters of the half blood, contend that the residuum is to be divided into six shares, the sisters to take one share each, and the children of Mary Fuller, deceased, one sixth, or one share between them. Hannah Goldsmith, Carrie Manheimer, and Rosa Fuller, who are nieces, children of a sister of the whole blood, urge and claim that the residuary estate is to be divided equally between the legatees named in the residuary clause, share and share alike.

The decision of the Court below was as follows :

"1. The said Michael Reese made, published, and declared his last will and testament in manner and form set out in the complaint in this action. The will was an holographic will. A true and photographic copy thereof is hereto annexed, marked Exhibit 'A,' and made a part hereof.

"2. Said last will and testament was duly admitted to probate, and letters testamentary issued to the plaintiffs, as is averred in the complaint.

"3. That said defendants Eliese Frank, Henrietta Rosenfeld, and Hannah Rosenberg, were sisters of the whole blood of said Michael Reese, deceased.

"4. That said defendants Therese Wineman and Lena Kohn, were sisters of the half blood of said Michael Reese, deceased, having the same father as said Reese, but not the same mother.

"5. That the mother of said Therese Wineman and Lena

Cohn was second wife of the father of said Reese, and was still living at the time of the decease of said Reese.

"6. That said Hannah Goldsmith, Carrie Manheimer, and Rosa Fuller were nieces of said Reese, being daughters of his sister of the whole blood, Mary Fuller, who died prior to the death of said Reese, and prior to the making of said will.

"7. Said Reese was a native of the Kingdom of Bavaria, and came to the United States when about twenty years of age; came to California in 1850, and remained there, with the exception of a few brief visits in the East; died at the age of sixty-four years, and never had been married.

"8. He was a shrewd man of business, and managed his own affairs himself; his current business during the latter part of his life embraced millions of dollars yearly. He largely borrowed and loaned money; dealt in bonds, stocks, and other securities, and also in real estate, and engaged in other enterprises. Said Reese did not keep his own books of account.

"9. That said Michael Reese was not in the habit of examining legal questions, or reading legal decisions or statutes for himself. And as a conclusion of law, the Court finds that the true construction of said will is, that by the residuary clause thereof, the said residuary legatees take the residue of said estate as follows, that is to say: The said Elise Frank, two elevenths ($\frac{2}{11}$) parts; the said Henrietta Rosenfeld, two elevenths ($\frac{2}{11}$) parts; the said Hannah Rosenberg, two elevenths ($\frac{2}{11}$) parts; the said Therese Wineman, one eleventh ($\frac{1}{11}$) part; the said Lena Kohn, one eleventh ($\frac{1}{11}$) part; the said Hannah Goldsmith, one eleventh ($\frac{1}{11}$) part; the said Carrie Mannheimer, one eleventh ($\frac{1}{11}$) part; and the said Rosa Rothschild, one eleventh ($\frac{1}{11}$) part of said residue or surplus, and not otherwise."

The decree of the Court was in accordance with the conclusions of law above given.

The parties to whose claims the judgment of the Court below was adverse, who are the sisters of the half blood and the nieces, moved for a new trial, which was denied, and the same parties prosecuted an appeal to this Court from the judgment and the order denying their motion for a new trial. During the argument a question was raised as to the jurisdic-

tion of the District Court in this case. A difficulty was suggested by a member of the Court on the ground that the Probate Court had jurisdiction of the subject-matter of this cause, and that its jurisdiction was exclusive. We have considered this question, and in our opinion, the jurisdiction of the District Court was ample and plenary. The jurisdiction of the District Court was conferred by the amendments of 1862 to the Constitution of 1849. (See § 6 of art. vi.) In this section it is provided that "The District Courts shall have original jurisdiction in all cases in equity."

The jurisdiction could hardly have been conferred in clearer or broader language. The language of the sixth section of this article, as it was adopted in 1849, was no less broad.

This section as amended in 1862, has been construed by this Court, as conferring on the District Courts the same jurisdiction in equity as that administered by the High Courts of Chancery in England. (*People* v. *Davidson*, 30 Cal. 379.) In *Willis* v. *Farley*, 24 id. 500, it was held that the Constitution (art. iv, § 6) invests the District Court with original jurisdiction in all cases in equity. The Court further said in that case: "Powers which are granted by the Constitution can not be taken away by legislative enactment, and remedies which are secured to the citizen by the organic law can not be destoyed by a department of the Government that exists in subordination to the Constitution." This was in an action brought against the administrator of deceased mortgagor and his heirs. to foreclose a mortgage. (See also *Clarke* v. *Perry*, 5 Cal. 60; *Sanford* v. *Head*, id. 298; *Deck* v. *Gerke*, 12 id. 436.) In the last cited cause Baldwin, J., in the opinion of the Court, says on this subject: "Apart from the previous decisions of this Court, it might be questioned whether the Probate Court, under our Constitution, did not possess an exclusive jurisdiction over testamentary and probate matters. (*Blanton* v. *King*, 2 How., Miss., 856; *Carmichel* v. *Browder*, 3 id. 252; *Faroes* v. *Graves*, 4 S. & M. 707.) But this Court has recognized a different rule. In *Clarke* v. *Perry*, 5 Cal. 60, it was held: 'The Probate Court is a Court of special and limited jurisdiction. Most of its general powers belong peculiarly and originally to the Court of Chancery, which still retains all its jurisdiction. Where, therefore, a bill is filed in

chancery against an administrator, to compel him to account, by one who has not been an actual party to a proceeding or settlement in the Probate Court, he may totally disregard such proceeding or settlement; and although the settlement in the Probate Court is a final settlement, the complainant, who was no party to it, may treat it as a nullity, and proceed to invoke the equitable powers of the District Court, and compel the administrator to a full account.' And in *Sanford* v. *Head*, id. 298, the same doctrine was reaffirmed in emphatic terms. The ground upon which equity took jurisdiction in England in such cases was, that the Spiritual Courts were not able, from their constitution, to afford adequate and complete relief. (1 Story's Eq. Jur., § 530 *et seq.*) Though much of the reason of this rule is removed in most of the States of the Union where Probate Courts exist, yet the power of the Chancery Court to interpose for the settlement of accounts, and the enforcement of trusts of this sort, is maintained. Under the decisions of this Court, Chancery has assumed jurisdiction over such subjects, and as, probably, rights have vested under their decrees, and the principle asserted is more convenient in practice, we think it is not permissible now to question the jurisdiction." (*Decke* v. *Gerke*, 12 Cal. 436.)

The Court in this case sustained a very broad jurisdiction in the District Court.

The jurisdiction here invoked was exercised in the case of *Payne* v. *Payne*, 18 Cal. 291, in construing the will of Theodore Payne. One of the points determined in that case, was as to whom the estate was devised, which might have been determined by the Probate Court on the distribution of the estate by that tribunal. The Court held that the whole estate was devised to the widow, to the exclusion of the children. There was no doubt expressed or intimated as to the jurisdiction in that case.

The power of the Court of Chancery in England over the administration of estates, does not seem to have been thoroughly established until near the close of the reign of Charles II. (See Story's Eq. Jur., § 542.) After the statute in England had been enacted, empowering the Spiritual Courts to

make distribution, it was contended that that Court ought to make distribution, and that the Courts of Chancery no longer had jurisdiction. In answer to this contention, the Lord Chancellor King said in 1682, the "Spiritual Court had but a lame jurisdiction, and there being no negative words in the Act of Parliament, he thought a bill for distribution very proper in this Court"—referring to the Court of Chancery in which he presided. (Story's Eq., §§ 542, 543; *Gould* v. *Hayes*, 19 Ala. 449. See further, Story's Eq., § 1065.)

The jurisdiction of the Probate Courts is not defined in the Constitution. In the eighth section of article vi, Constitution of 1849, it is provided that "the County Judges shall also hold in their several counties Probate Courts, and perform such duties as Probate Judges as may be prescribed by law." In the seventh section of the same article it is provided : "In the City and County of San Francisco, the Legislature may separate the office of Probate Judge from that of County Judge, and may provide for the election of a Probate Judge, who shall hold his office for the term of four years."

It seems from the above that the Legislature may make the jurisdiction of the Probate Judge or Court what it pleases, within the limits of that jurisdiction, which is understood as usually pertaining to Probate Courts. But the position that it can, under this power, take away from the District Courts any of the equity jurisdiction conferred on them by the Constitution, is manifestly untenable. (See *Willis* v. *Farley*, 24 Cal. 499, above cited; also *Gould* v. *Hayes*, 19 Ala. 450.)

Nor could this be done if the full probate jurisdiction was conferred on the County or Probate Courts by the Constitution. This very point was so held in *Courtwright* v. *The Bear R. and A. W. & M. Co.*, 30 Cal. 573, in relation to the jurisdiction to abate nuisances under the constitutional amendments of 1862. This Constitution gave jurisdiction to the County Courts in plain terms "*to abate a nuisance.*" (See § 8, art. vi.) An action was brought in the District Court to abate a nuisance, and it was sustained as an equity case under the grant of equity jurisdiction. The question is fully discussed in the opinion of the Court by Rhodes, J., to which there was no dissent, Sanderson, J., expressing no opinion. This ruling was subsequently approved in *Yolo County* v.

*City of Sacramento,* 36 Cal. 195. (See also *Caulfield* v. *Stevens,* 28 Cal. 118; *Stoppelkamp* v. *Mangeot,* 42 id. 325.)

As was said by Bronson, J., in *Delafield* v. *State of Illinois,* 2 Hill, 164: "There is nothing *in the nature of jurisdiction,* as applied to Courts which renders it exclusive. It is not like a grant of property, which can not have several owners at the same time. It is a matter of common experience that two or more Courts may have concurrent powers over the same parties and the same subject-matter. Jurisdiction is not a right or a privilege belonging to the Judge, but an authority or power to do justice in a given case, when it is brought before him. There is, I think, no instance in the whole history of the law where the mere grant of jurisdiction to a particular Court, without any words of exclusion, has been held to oust any other Court of the powers which it before possessed. Creating a new forum with concurrent jurisdiction may have the effect of withdrawing from the Courts which before existed, a portion of the causes which would otherwise have been brought before them; but it can not affect the power of the old courts to administer justice when it is demanded at their hands."

For the reasons above given we are of opinion that the District Court has jurisdiction of this cause.

But it is said that the Probate Court first acquired jurisdiction, and therefore must be allowed to exercise it to the exclusion of the District Court. We do not think that this rule can be properly applied here. The will, so far as we are informed by the transcript, had only been admitted to probate in the Probate Court. The matter of distribution was not before it. The proceeding in that Court had not progressed to that point. Moreover, the Probate Court held its jurisdiction subject to the exercise of this jurisdiction by the District Court. The paper was not the operative will of the testator until probate had been had. It can not be offered in evidence to show title until it has been proved. (*Castro* v. *Richardson,* 18 Cal. 478.) Of the probate the jurisdiction of the Probate Court is exclusive. (*San Francisco* v. *Lawton,* id. 470.) Until that was done the District Court could not exercise the jurisdiction invoked in this case. To hold that the Probate Court had first acquired jurisdiction to the exclu-

sion of any other Court by the will having been admitted to probate in it, would be to oust the jurisdiction of the District Court entirely.

The Probate Court taking jurisdiction under these circumstances, it holds it subject to the jurisdiction of the District Court, and must be bound by the decree of the District Court. We are of opinion that this jurisdiction in the District Court is a beneficial one, and can be usefully employed in expediting the settlement of estates.

To return to the main question: Certain rules are prescribed by the Civil Code for the interpretation of wills. Those rules seem to be in accord with the rules heretofore laid down by Courts for such interpretation, and which have been for a long period of time acted on. (See Broom's Legal Maxims, on maxim *"Benignæ faciendæ,"* p. 534, *et seq.*) These rules are as follows:

1. "A will is to be construed according to the intention of the testator. Where his intention can not have effect to its full extent, it must have effect as far as possible." (Civ. Code, § 1317.)

2. "In case of uncertainty arising upon the face of the will, as to the application of any of its provisions, the testator's intention is to be ascertained from the words of the will, taking into view the circumstances under which it was made, exclusive of his oral declarations." (Civ. Code, § 1318.)

3. "The words of a will are to be taken in their ordinary and grammatical sense, unless a clear intention to use them in another sense can be collected, and that other can be ascertained." (Civ. Code, § 1324.)

4. "The words of a will are to receive an interpretation which will give to every expression some effect, rather than one which will render any of the expressions inoperative." (Civ. Code, § 1325.)

5. "All the parts of a will are to be construed in relation to each other, and so as, if possible, to form one consistent whole; but where several parts are absolutely irreconcilable, the latter must prevail." (Civ. Code, § 1321.)

The particular question presented here is, what effect is to be given to the words *"pro rato,"* in the residuary clause? To what do they refer? That these words were intended to

be "*pro rata,*" there can be no doubt. What, then, is their meaning, and to what do they refer? This expression is of very common use. So frequent is and has been its employment in daily intercourse among all classes of men, that it may almost be said to have become part of our vernacular. From it, a verb, "*pro-rate,*" has been derived and become a part of the common English tongue, with all the characteristics of such a part of speech. (See Webster, word prorate.) This verb is found used in the appropriate moods and tenses, with participles, and is thus defined: " To divide or distribute proportionately; to assess *pro rata.*" These words *pro rata* have a defined and well-understood meaning. They are defined as follows by the two most famous lexicographers of our time. Webster defines them as follows: Latin, *pro rata* (sc. *parte*), according to a certain part; in proportion." Worcester thus defines them: "(L. *according to the rate*) (com.) in proportion."

The word "*rata*" is the participle of the Latin word *reor.* Its principal parts are thus given in Ainsworth's " English-Latin Dictionary :" "*Reor, reri, ratus*"—meaning, according to the same authority—*To suppose, judge, deem, or think ; to imagine.*"

This expression is of frequent use in statutes, in the opinions of learned judges, and by text-writers on various titles of the law. A long list of references will be found in the brief filed in this case by one of the counsel for respondents. (See brief of S. M. Wilson, Esq., 19, 20, etc.) We will content ourselves with citing· some of them. In statutes, §§ 5091, 5102 of the Revised Statutes of the United States; 5 U. S. Stats. at Large, § 5, 444; § 10, 447; 10 id. 304; 14 id. § 27, 529; Code Civ. Proc., §§ 1645, 1648; Insolvency Act of 1880, § 31; Cowdery's Insolvency Law, 45.

In opinions. (See *Adams* v. *Haskell,* 6 Cal. 116; *Adams* v. *Hackett,* 7 id. 187; *Adams* v. *Woods,* 8 id. 155; S. C., id. 311; *Naglee* v. *Minturn,* id. 540, 541, 543, 544; *Kehr* v. *Smith,* 20 Wall. 31; *Pollard* v. *Bailly,* 20 id. 527; *Caze* v. *Baltimore Ins. Co.,* 7 Cranch, 362; *U. S.* v. *Kansas P. R. R. Co.,* 99 U. S. 458; *Myrick* v. *Thompson,* id. 291; *In re London I. N. Co.,* 5 Law Rep. Eq. Cas. 526, 527; *Goodman* v. *Pocock,* 15 Q. B.

576, 581 ; *Vhirboom* v. *Chapman,* 13 Mee. & W. 248 ; *Manice* v. *Manice,* 1 Lans. 352, 353.)

By authors of books on the law—"*pro rata itineris,*" see 3 Kent's Com. 229 *et seq.;* Abbott on Shipping, 525, 547; as to *pro rata* contribution by property saved on a *general average,* see Abbott on Shipping, 502 *et seq.*

Where a voyage is not completed, and the goods are, with the consent of the owner, returned to him, the carrier being willing to complete the voyage, a payment of freight is allowed in proportion to that part of the voyage accomplished, and the freight so allowed is usually styled freight "*pro rata itineris.*" As the entire freight for the entire voyage, so the partial freight for the partial voyage is allowed.

It is needless to multiply citations or illustrations further on this point. It is well understood by persons of ordinary intelligence to denote a disposition of a fund or sum indicated in proportion to some rate or standard, fixed in the mind of the person speaking or writing, manifested by the words spoken or written, according to which rate or standard the allowance is to be made or calculated. The fund of which distribution is thus to be made must be indicated by the words spoken or written by the speaker or writer.

Now are any fund and rate or standard indicated by the writing which we are called on to interpret ? In relation to the fund, there can not certainly be any difficulty. It is the residuum of the estate after the payment of the debts and the legacies specifically defined in the will. Is there any rate or standard manifested by the words used in the will.

As has been pointed out, the testator, after directing the payment of his debts as soon as possible, orders that the rest of his property shall be converted into cash within five years after his death by his executors, and the fund so created to be divided as follows :

" To my sisters Eliese Frank, Henerietta Rosenfeld, Hanna Rosenberg * * * one hundred thousand dollars *each* to my sisters Therese Weinman and Lena Cohn * * * fifty thousand dollars each. To Jakob Rosenberg * * * in trust for Hannah Goldsmith, Carry Manheimer, and Rosa Fuller one hundred and fifty thousand dollars."

He then proceeds to make bequests to several persons and

corporations, embraced in seventeen different clauses, which intervene the clauses containing the bequests above quoted, and then disposes of the residuary estate in words which have been quoted above.

Now the same persons are referred to as beneficiaries in the last clause just above referred to and quoted as in the first quoted clause. The reference in both clauses to the same persons shows that the dispositions of the first clause were in the mind of the testator when he wrote the last clause. The mode of distribution between those persons was then to be manifested—and he provides for a *pro rata* distribution among them. But according to what rule is this *pro rata* distribution to be made? This is to be provided for, and the testator adopts as the rule denoting the proportion in which this distribution is to be, the sums mentioned in the first clause. In effect, he provides in this last clause, that the residue shall be divided among them in the same proportion which the sums mentioned in the first clause indicate.

The reference to the first clause by the last is plainly manifest from his mentioning the same persons in both as beneficiaries. The *pro rata* distribution is to be in accordance with some rate previously indicated. The sums mentioned in the first clause of themselves furnish a rate or proportion, and it becomes unnecessary to indicate any other. To indicate any other in accordance with his wish, would have merely led to a repetition of what had been manifested by the expressions of the first and leading clause of the paper he was drawing. It is scarcely to be supposed that the ratio or proportion of distribution would be indicated in the clause in which it is mentioned. This is not usually the mode in which a division *pro rata* is directed. In the instances referred to above, whether in statutes, judicial opinions, or in the texts of law-writers, the *pro rata* distribution is spoken of in relation to something outside of the clause ordering or referring to such distribution, and not in the clause itself. The same is true of the *ratio* or *proportion* of distribution.

It is contended on behalf of Therese Weinman and Lena Cohn that the ratio or proportion of distribution referred to by the word *pro rata* is one according to which the residuary

estate is to be divided into six parts, so that each of the sisters is to recover one sixth of the residuum, leaving the remaining sixth to his nieces Hana Goldsmith, Carry Manheimer, and Rosa Fuller.

It is urged that the words *pro rata* mean a proportion, fixed *rata*—established according to a rule—and that that rule is fixed by the Statute of Distributions; that this rule would fix the proportion according to which a division should be made, and thus the distribution or division would be *per stirpes* according to the statute, into six parts, each of which would be a sister's share. This would lead to the division just above stated, according to which each of the sisters would get a sixth, and the nieces the remaining sixth, or one eighteenth each.

We see no grounds whatever for such a construction of the words of the residuary clause. It seems to us conjectural, fanciful, and untenable. There is nothing in the will suggestive of such a view; on the contrary, the contents of the will indicate something entirely different. There is nothing in it which affords any ground to conjecture that the testator, intended to adopt the Statute of Distributions as a rule of distribution of the residuum or any other portion of his estate. The language of the will supports the inference that he intended to steer clear of any such mode of distribution.

The contention put forth on the part of the nieces (Hana Goldsmith, Carry Manheimer, and Rosa Fuller, the last now Rosa Rothschild, having since the execution of the will married a gentleman of that name), is that *pro rata*, though it means "proportionally," "according to a proportion," and is not a synonym for *equally*, yet a *pro rata* division constantly results in an *equal* division, and that since a *pro rata* division so results, therefore the division to be made of the residuary estate in this case must be into eight equal parts or shares, of which each of the persons named in the residuary clause is to have one part or share. This, as we understand it, is the contention of the learned counsel for the nieces. But he admits "it may be equal or unequal, according to the standard fixing the proportion of the division." If it be admitted that the standard fixing the proportion of the division is the number

(eight) of persons mentioned in the residuary clause, then the conclusion contended for follows.

We see no reason to conclude that a division into eight shares was intended. There is nothing in the expressions of the paper to be construed which indicates such an intention. If this had been the intention of the testator, or if his intention had been such as contended for by the half-sisters, Therese Weinman and Lena Cohn, it could have been readily expressed. It could have been easily indicated by stating that the eight persons should receive the residuum equally to be divided between them. Such a mode of diposing of property, to be equally divided, is so common that it can not be supposed that it would not have occurred to the testator, and been adopted by him, if such had been his wish.

There is nothing to show that the testator did not understand the meaning of the expression *pro rata* and all other expressions used in his will, nor would we be authorized in coming to any such conclusion. On the contrary, the clearness with which the will is drawn, and the uncontradicted evidence embodied in the transcript, authorize the conclusion that he was a man of strong, clear mind, and that he knew how to use language to express his thoughts.

Edward J. Pringle, an able and learned member of the bar of the city of San Francisco, states in his testimony that he knew Mr. Reese for about twenty-five years, and during a considerable portion of that time had a good deal to do with Mr. Reese in his law business; that " he was a remarkably shrewd man of business;" " he was a man of remarkable ability—one of the ablest men I have ever met by way of natural talent—a man of large memory." The same witness further states : " He was a man exact to know his bargain and the terms of his bargain. He was a man of great details in his bargains and contracts. He made his bargains with great care—in buying and selling." Mr. Pringle had abundant opportunities of ascertaining what he testified about, and was a competent judge as to the testator's mental endowments.

Another witness, Joseph Rosenberg, who had opportunities of knowing the testator well and of an extended acquaintance with his business habits and qualifications, as he was in the management of much of Reese's business from 1872 to

his death in 1878, and intimately associated with him, said :
" I could not approximate the amount of his annual business.
*It ran into millions.*"    " He bought and owned a great deal
of real estate, and purchased bonds, warrants, and stocks."
" He always took a great pride in attending to money matters,
and was very methodical in the mode of conducting and man-
aging his business.    He had a great deal of system and good
judgment, and I think in the whole seven years he hardly
made a loss."    " He was a man in the habit of reading a great
deal ; subscribed for German periodicals, and read and quoted
Shakespeare a great deal, and a great many other books and
German periodicals, and read the daily papers."

Such testimony establishes the clear intellect and sound
judgment of the author of the will in question ; and shows
a capacity displayed in the will to express his ideas with
force and clearness.    Though much of the orthography is in-
correct, it is clear and perspicuous, and its meaning can be
understood.    It is of frequent occurrence that men of clear
and vigorous minds and who think, speak, and write clearly,
spell badly.    History affords many instances of it.    Carlyle
says that Marshal Saxe was the worst speller that ever lived.
The great Duke of Marlborough, who was not only distin-
guished as a successful warrior, but also as an able statesman
among able statesmen, had the same failing, and if we may
credit Madame de Remusat, Napoleon was remarkably defi-
cient in writing and speaking the French language, which may
be said to have been his native tongue.    The phonetic style
of writing does not necessarily detract from the clearness of
a composition.    In relation to this will one of the learned
counsel (H. S. Monroe, Esq., of the Chicago Bar), who argued
the cause before the Court, stated that he saw no want of
clearness in any part of the will, except in the clause in re-
gard to the residuary estate.    This can rarely be said of a
paper disposing of so large an estate, containing so many pro-
visions.

It is evident, from the testimony above referred to, that
the testator, whose early education was limited, endeavored,
by reading, to repair the deficiency consequent upon it.    His
early instruction was supplemented by efforts through his
life to educate and improve his mental powers and enlarge

his attainments; and they were further improved and enlarged by intercourse and contact with men of vigorous minds—a means of education often far superior to that of mere scholastic training.

On the argument, and in the briefs filed, numerous cases were referred to and commented on. An examination of them has convinced us that they offer no obstruction to the conclusion here reached. The case before us is one of interpreting the meaning of a written document, and decided cases afford but little aid in arriving at a correct interpretation. We hazard nothing in saying that this is in accordance with the universal experience of gentlemen learned in the law, who have been frequently called on to employ their faculties in the solution of such questions. The good sense of what was said by Washington, J., in 1803, in *Lambert's Lessee* v. *Paine,* 3 Cranch, 131, will be generally acknowledged: "Except for the establishment of general principles, very little aid can be procured from adjudged cases in the construction of wills. It seldom happens that two cases can be found precisely alike." (See Redfield on Wills, 423; *Cook* v. *Weaver,* 12 Ga. 47; 4 Kent's Comm. 534.)

The contentions of the counsel for appellants are based on the proposition that the residuary clause of the will does not refer to the antecedent clause in the beginning of the will, and therefore the residuary clause must be construed as entirely separated from such antecedent clause. As has been said above, such a view is not maintainable. The reference to the antecedent clause is, in our judgment, clear and manifest.

The conclusion here reached is in accordance with natural affections. The full sisters get a larger share than the half sisters, and the half sisters are placed on an equality with the children of a full sister.

Admitting that our statute makes no difference between sisters of the whole and the half blood in the distribution of the estates of intestates, still this matter of natural affection can not be regulated by law. It follows other laws existing in the nature of man. Generally we should expect to find a stronger attachment to the sisters of the whole than to those of the half blood.

Our conclusion is that the Court below committed no error in its rulings and the judgment and order denying a new trial are affirmed.

MORRISON, C. J., and SHARPSTEIN, J., concurred.

ROSS, J., concurring:

I concur in the judgment and in what is said by Mr. Justice Thornton respecting the construction of the will of Michael Reese, deceased. With respect to the question of jurisdiction, I would be inclined to hold, if the question was before us as an original proposition, that the construction of the will of a deceased person was, under our late Constitution and laws, within the exclusive province of the Probate Court. But the jurisdiction of the District Courts in such cases has been recognized by previous decisions of this Court, under which, it is probable, important property rights have vested, for which reason I think the question ought not now to be agitated.

MYRICK, J., dissenting:

This is an action brought in a District Court, prior to the adoption of the new Constitution, by the executors of the will of one Reese, againt the residuary legatees, for the purpose of obtaining a construction of the will. The plaintiffs allege that the will was probated in San Mateo County, where the administration is still pending; "that doubts have arisen and are entertained by the plaintiffs and other parties to this action as to the true intent and construction of said will, and particularly the residuary clause aforesaid, and that the plaintiffs are desirous that a judicial determination may be made of the various questions arising on said will involving the points and particulars hereinafter mentioned, and a construction given to the same, so far as may be necessary to guide and direct the plaintiffs in the discharge of their trusts as executors as aforesaid, and to settle and finally determine the rights of the parties in the premises."

"That the particular questions on which the plaintiffs desire the opinion and judgment of the Court, relate to the claims of the respective legatees aforesaid as to the meaning

of the residuary clause of said will, and they ask the Court to construe said will and declare the true intent and meaning of the said residuary clause, and especially to determine in what proportion the estate to be distributed under said clause is to be divided between the said legatees therein named, and what portion each of the said legatees is entitled to receive."

"That the determination of said questions is necessary for the guidance of the plaintiffs as executors aforesaid, and the settlement and distribution of the estate."

"Wherefore, the plaintiffs pray that the questions arising upon said will as aforesaid, and such other questions of difficulty or doubt in the construction of said will as may be presented by the answers of the defendants, or any of them, or otherwise properly brought before the Court, may be judicially determined and adjudged, to the end that the same may be finally settled, and that the plaintiffs may be directed how to proceed in the execution of their trust; and for such other and further relief as the Court may deem proper."

The defendants answered, setting up their respective claims to share in the residue of the estate, but no question is made by either party as to the jurisdiction of the Court. That question seems to have been studiously passed over in the pleadings. Attention, however, was directed to it on the argument.

After listening to elaborate and learned arguments regarding the points presented, I am free to say that, in my opinion, as a matter of law, the view taken by the Court below as to the proper construction of the will is correct; but I can not join in a vote to affirm the judgment, because by so doing I should tacitly join in saying that the Court below had jurisdiction, and that under the late Constitution the District Courts had at least concurrent, if not exclusive, jurisdiction in many matters concerning the administration of the estates of deceased persons. In my opinion, the action should have been dismissed by the Court below for the following reasons:

1. Under our system, a Court of Equity, as such, has no jurisdiction over the subject-matter of this action. The claim of jurisdiction is based upon the clause in the late Constitu-

tion, article vi, § 6: "The District Courts shall have original jurisdiction in all cases in equity." This language would seem to fully support the claim of jurisdiction; but let us see how far that would carry us. Formerly equity had jurisdiction:

I. It had general jurisdiction over cases of administration. (1 Story's Eq. Jur., §§ 530–589.) The Ecclesiastical Courts or the Ordinary could appoint an administrator, could settle an account of an administrator, and direct the delivery of a legacy to the legatee; but could not compel an administrator to render an account, nor compel many other acts necessary to the settlement of the estate; therefore, equity assumed jurisdiction, to the end that justice might be done. Does any one now suppose, that under our system, it is necessary, or even admissible, to go into equity to compel an accounting by an administrator? Yet, the entertaining of a bill to compel an administrator to render an account is as much within the clause "all cases in equity," as is a bill for the construction of a will before distribution.

II. A creditor could not prove his claim before the Ecclesiastical Court or the Ordinary, nor obtain its payment. (See Story, *supra*.) His resort was to a Court of Equity, to prove his debt and have it established, and then to have his action at law to recover. What lawyer in this State, having a claim against the estate of a deceased person for a debt, would go into a Court of Equity to have the claim established? And yet, the establishing of a debt against the estate of a deceased person is as much within "all cases in equity" as is the construction of a will before distribution.

III. If a testator did not dispose of the residue of his estate, "the spiritual courts had 'no jurisdiction whatever to enforce a distribution." So, equity assumed jurisdiction and enforced a trust in the executor in favor of the heirs-at-law. Does any one in this State suppose that if there be a residue undisposed of by the will, a Court of Equity can be resorted to to ascertain the heirs-at-law, and to have a trust declared in their favor, instead of proving in the Probate Court the heirship and obtaining distribution therein ? And yet, the ascertainment of the heirs-at-laws and the declaration of the

trust are as much the subject of equity jurisdiction, as is the proper construction of a will before distribution.

IV. The Ordinary had no power over the real estate of a deceased·person, and could not subject it to the payment of debts; therefore, if the personalty was insufficient, recourse was had to a Court of Equity to subject the realty to the claims of creditors.   If the claim made in this case be correct, in the few words said upon the argument, as to the power of the Legislature to confer upon the Probate Courts any equitable jurisdiction, it must necessarily follow that the Legislature had no authority to confer upon the Probate Courts power to sell real estate; and it would also necessarily follow that all sales of real estate had by the Probate Courts in this State conferred no title upon the purchasers—propositions that would not be favorably entertained for a moment.   And yet, subjecting real estate to the payment of the debts of a deceased person is as much within " cases in equity" as is the construction of a will before distribution.

V. In England, the Spiritual Court or the Ordinary, and in America, the Surrogate, as such, had no authority, where property was left in trust for an illegal or void purpose, to so determine, but resort was had to a Court of Equity, which determined the matter, and declared a trust in favor of the residuary legatee or heir-at-law.   I have no doubt that under our system the Probate Courts could determine in such case, and make a proper decree of distribution; and yet, such matter is as much within equity jurisdiction as is the subject-matter of the present action.

VI. In regard to legacies, no suit would lie at law to recover them, unless the executor had assented thereto; but the remedy was exclusively in the Ecclesiastical Courts, or in Courts of Equity.   In *Ex parte Smith,* 53 Cal. 204, this Court has sanctioned quite a different course; yet, the recovery of a legacy is as much a " case in equity" as is the case under consideration.

VII. Bills of discovery were essentially a part of equity jurisdiction.   Referring to §§ 1458–1461, Code Civ. Proc., will it be claimed that those sections are void as trenching upon equity jurisdiction ?   And yet, is not the relief therein

intended to be afforded as much within "cases in equity" as that at bar ?

VIII. Another branch of jurisdiction peculiarly appertaining to equity was the appointment of guardians for infants, idiots, and lunatics, and the care and management of the persons and property of the wards. Not a word in the Constitution in terms takes that jurisdiction away from the catalogue of "all cases in equity." Yet, if a strict construction is to be given, what becomes of a jurisdiction exercised for as many years as the State has existed, and applicable to an immense amount of property ? If, under the Constitution, the Legislature had no authority to take from Courts of Equity any portion of their former jurisdiction and vest it in a court not strictly one of equity jurisdiction, a result would follow not profitable to contemplate, except for illustration.

IX. Specific performance is essentially a branch of equity jurisdiction. Under §§ 1597–1607, Code Civ. Proc., many deeds have been made in this State by executors and administrators, upon orders made by Probate Courts, and the titles thereby attempted to be made have been acted upon and recognized as valid. Yet the compelling of an executor or administrator, representing a deceased person who was bound by contract in writing to execute a deed, is as much a case in equity as is the matter now before us.

I am aware of what is said in 2 Story's Eq. Jur., §§ 1058–1074, concerning the jurisdiction of courts of equity to construe wills in aid of their due execution; but I shall show that, in my opinion, what is there said has no application in this State, so far as concerns questions similar to this under consideration, arising during administration. Just here I will allude to a case to which reference has been made as sustaining the proposition that the District Court had jurisdiction, viz.: *Griggs* v. *Clark*, 27 Cal. 427. That was an action brought by an administrator against a surviving partner of the intestate, to compel an accounting of the partnership affairs of the intestate and the defendant, and the Court, Crocker and Norton, JJ., concurring, say: "It is contended that the Probate Court, in which the proceedings for the settlement of the estate were pending, had acquired jurisdiction of the subject-matter of the present action, and therefore the

demurrer should have been sustained. The jurisdiction vested in the Probate Court does not divest the District Courts of their general jurisdiction as Courts of Chancery over actions *of this character.*" If that decision is authority to sustain the action at bar, I fail to see it.

The case of *Payne* v. *Payne,* 18 Cal. 291, is no authority in this case; that was an amicable suit, as this is; neither party raised the question of jurisdiction; it was not passed upon; it does not appear from the case, as reported, that the estate was being administered upon in the Probate Court.

2. The Probate Court of San Mateo County had exclusive jurisdiction of the subject-matter of the action, and to determine to whom and in what proportions the estate of the testator should be distributed.

The Constitution of this State, as originally adopted, provided, article vi, § 1, that "the judicial power of this State shall be vested in a Supreme Court, in District Courts, in County Courts, and in Justices of the Peace, and in such inferior Courts," etc.; and, § 8, the County Judge shall "perform the duties of Surrogate or Probate Judge." It is not necessary to consider the force and effect of those provisions, further than to say that all the cases in this Court upon this subject, from *Wilson* v. *Roach,* 4 Cal. 362, to *Payne* v. *Payne,* 18 id. 291, arose thereunder. In 1862, the Constitution was amended so as to read, article vi, § 1 : "The judicial power of this State shall be vested in a Supreme Court, in District Courts, in County Courts, in Probate Courts," etc.: and § 8, "The County Judges shall also hold Probate Courts, and perform such duties as Probate Judges as may be prescribed by law." Then, at least, the Probate Courts were distinctly recognized as, if not established, and were, and since have been, constitutional Courts. Very soon after the adoption of these amendments, this Court, *In the Matter of the Will of Bowen,* 34 id. 682, Rhodes, J., delivering the opinion, referring to § 8, said : "This is a comprehensive grant of probate jurisdiction, and as there is nothing in the article *granting concurrent jurisdiction,* the grant to the Probate Courts *must be held exclusive.* There may be cases involving matters peculiar to Probate Courts of which the District Courts may have juris-

diction; but matters like the probate of a will, the granting of letters testamentary, or of administration, the allowance of claims, the settlement of the accounts of the executor or administrator, etc., were well understood at the time of the adoption of the amendments to the Constitution as falling within the probate jurisdiction. If, without any express grant, like that in the former Constitution, the District Courts can be vested by the statute with jurisdiction of the matters provided by § 20 of the Probate Act, the jurisdiction to determine every question of fact arising in the Probate Courts may likewise be transferred to the District Courts, and the Probate Courts left as the mere registers of the decisions of the District Courts."

In England, the Ordinary, and in America the Surrogates, until their jurisdiction was enlarged, were little else than registers.

The amendment to § 8 says: "Shall hold Probate Courts and perform such duties as Probate Judges as may be prescribed by law." This provision takes from courts of equity every matter relating to "probate" of which they had formerly had jurisdiction, and confers it upon the Probate Courts. That leads me to consider what is probate. Probate, in England, in the absence of an enlarged meaning by statute, signified *only* the proof of a will either in solemn or common form. (2 Black. Com. 508.) Is that all that the framers of our Constitution meant? or, rather, did they not mean, that which, all matters which, at the time of using the words, was and were understood to be a part of or parts of probate business? Abbott, in his Law Dictionary, title "Probate Court," says: "In many of the United States, Court of Probate, or Probate Courts, is used as the title of the court having general probate jurisdiction; that is, to take proof of wills, to issue letters testamentary, letters of guardianship and of administration, to superintend the administration of estates, and accounting of representatives and trustees, and many cognate matters."

Under the Constitution, the Legislature, in prescribing by law the duties of the Probate Courts, did confer upon them power to grant letters testamentary, of administration, and guardianship, the management of estates of deceased persons

and wards, the compelling and settling of accounts, the dis-
covery of effects, the sale of real estate, the payment of debts
and the distribution of "the residue of the estate in the
hands of the executor or administrator, if any, among the
persons *who by law are entitled thereto.*" This last clause
necessarily involves the right and power to ascertain and de-
termine who are entitled thereto. The power was ample, the
machinery was ample. The Probate Courts did not require
the aid of any other Court in ascertaining any questions of
fact before them, and from their decisions an appeal lay
directly to the Supreme Court.

From these views, thus briefly stated, I am of opinion that,
under the late Constitution, all matters concerning the ad-
ministration of estates of deceased persons, such as the
matters above referred to, were not to remain "cases in
equity," but were transferred and became probate matters;
and that in the creation of the various Courts, and in defin-
ing their respective jurisdictions, it was intended that one
should not trench upon the other, and that there should not
be, as to probate matters, concurrent jurisdiction.

The reason why, in former times, equity assumed jurisdic-
tion of the various matters hereinbefore referred to, was
because, in England, the Ecclesiastical Courts and the Ordi-
nary, and in America the Surrogates, had no jurisdiction, and
had no machinery for affording relief. Those reasons do not
exist in this State. With us, the Probate Courts had juris-
diction conferred, and had ample machinery provided, to hear
and determine all matters necessary to a full administration
of an estate, *as between all persons interested in its admin-
istration as such.*

This view is not in conflict with *Haverstick* v. *Trudel,* 51
Cal. 434; nor with *Bush* v. *Lindsey,* 44 id. 121. It is sup-
ported by *Auguisola* v. *Arnaz,* 51 id. 435, where the Court,
Rhodes, J., said: "The Probate Courts have exclusive juris-
diction of the accounts of executors and administrators, and
of the final distribution of the estates of decedents."

I admit there may questions arise, as suggested in 51 Cal.
435, *supra,* when the interposition of a Court of Equity may
be necessary. (See *Theller* v. *Such,* Department One of this
Court, opinion filed May 16th, 1881, in which opinion I

concur, as presenting a case clearly within equity jurisdiction); but the case at bar does not present such a question. In my opinion, the construction of the will in question was as much within the power of the Probate Court of San Mateo County, for the purpose of determining the persons to whom and the proportions in which the residue of the estate should be distributed, as would have been the hearing of evidence and determining as to heirship if the deceased had died intestate.

3. Even admitting, which I do not, that there was concurrent jurisdiction in the District Court and in the Probate Court, there is a well-known principle that where two separate tribunals have jurisdiction over a subject, that which first takes jurisdiction shall have exclusive jurisdiction. The Probate Court, by probating a will, acquired and had jurisdiction of the subject-matter of the · estate, to and including the ascertainment of the persons entitled to the residue and its distribution among them; and no other tribunal could take jurisdiction of any matter concerning the administration of the estate, of which the Probate Court could in any event have jurisdiction. It therefore follows, that as the Probate Court was the only Court in which a will could be probated, no other Court could acquire any jurisdiction over the subject-matter of this action. Was the Probate Court to suspend its functions, and arrest its proceedings, until it should receive the advice of another Court ? Would that advice, when given, be binding upon the Probate Court ? If so, by what authority ? Where is it so set down ? Suppose this Court should affirm the judgment of the Court below, and the decree should be taken to the successor of the Probate Court, would that decree be binding upon that Court ? No appeal from the Probate Court is here—its judgment has not been given.

4. The executors have no concern as to how the estate should be distributed. It is quite immaterial to them whether the nieces should receive one sixth, one eighth, or one eleventh. If a decree had been made by the Probate Court distributing to any legatee more than the executors deemed proper, they could not have appealed from the decree. (*Bates* v. *Ryberg*, 40 Cal. 465 ; *Estate of Wright*, 49·id. 550.) If so, they could

not file a bill to be instructed as to a matter about which they had no concern. In the complaint, they ask the Court "to determine in what proportion the estate is to be distributed," and " what portion each of the said legatees is entitled to recover;" "that the determination of such questions is necessary for the guidance of the plaintiffs as executors aforesaid, and the settlement and distribution of the estate." Their functions were not to be informed how to distribute the estate; their functions were to file and settle their accounts, showing the balance for distribution, and petition that such balance be distributed to those entitled; the Court was then to cause notice to be given to all concerned, and the parties claiming were to present their reasons therefor *to the Court*, not to the *executors;* and the Court was to determine what persons were entitled, and in what proportions. As to such determinations, the executors had no voice—they could not be heard—they had no appeal. How can they file a bill asking for advice when the advice asked is entirely immaterial to them? The executors were officers of the Probate Court, and of no other. To that Court only could they look for advice and direction as to any matter within its jurisdiction, even where the advice is material to them.

The judgment should be reversed, with directions to dismiss the complaint.