IN THE MATTER OF THE ESTATE OF GEORGE W. GRANNISS, DECEASED.

[No. 24,305; decided October 9, 1902.]

Wills—Constructions Which Lead to Intestacy.—Such an interpretation should, if reasonably possible, be placed upon the provisions of a will as will prevent intestacy, total or partial. Ordinarily the presumption is that the testator designed to dispose of his entire estate, and the instrument will be so construed, unless the contrary is clearly shown by its terms or by evidence.

Wills are to be Liberally Construed so as to Effectuate the Intention of the testator, and it is the duty of courts to search for a construction that will carry such intention into effect.

Wills.—A Devise or Bequest of the "Residue" passes all the property which the testator was entitled to devise or bequeath at the time of his death not otherwise effectually disposed of by his will, unless it is manifest from the context or from the provisions of the will that the testator used the word in some more restricted sense.

Wills—Residuary Clause—Declaration that Property is Separate.—A will making certain bequests, and giving all the residue of the property to the daughter of the testator, passes to her all the property which he was entitled to dispose of at the time of his death and not otherwise effectually devised or bequeathed; and such residuary gift is not affected by a subsequent declaration in the will that all the estate therein devised is separate property.

Community Property.—Where the Only Earnings of the Testator, after his second marriage, were $900 during a period of eight years, while the appraised value of his estate was over $88,000, it was in this case held, following the rule that there is no presumption that the testator supported the family out of his separate estate and preserved the community funds intact, and considering the smallness of the sum earned as compared with the value of the whole estate, that the entire estate was separate property.

Community Property.—The Sums Gained by Two Investments in this case of a portion of the testator's separate property in Pacific Mail stock were held not "earnings," but belonged to the category of "rents, issues and profits," and formed a part of his separate property.

**Wills—Rules of Interpretation.**—Many of the rules which courts have adopted as guides in ascertaining the intention of testators assume such intention from words and phrases, where often it is very doubtful whether they were used with any intelligent application of the legal meaning given to them. But these rules have become, in many cases, rules of property, and work out in a majority of instances results as nearly just as may be. It is better to adhere to them in their integrity than to permit exceptions upon slight grounds.

**Wills—Construction of Residuary Clauses.**—The rule that, in the interpretation of wills, residuary clauses are to be given a broad rather than a narrow interpretation, has a stronger foundation in natural reason than have some of the other rules adopted by courts.

Application for final distribution.

F. S. Brittain, for Mrs. Elizabeth I. Granniss, widow.

Henry H. Reid, for Harriet G. Center, executrix.

COFFEY, J. This application is submitted upon the records and an agreed statement of facts in the terms of a stipulation that (1) said decedent died in the city and county of San Francisco, state of California, on the twenty-sixth day of January, 1901, and was at the time of his death a resident of said city and county; (2) he left him surviving his widow, Elizabeth I. Granniss, and his only child, Harriet G. Center; (3) his last will and testament, dated January 8, 1894, and a codicil thereto dated August 20, 1900, were duly admitted to probate by this court on February 18, 1901; (4) that the first wife of decedent, mentioned in his will dated January 8, 1894, died on the twelfth day of September, 1890; (5) he was married to said Elizabeth I. Granniss on December 27, 1892; (6) on the said twelfth of September, 1890, said decedent was the owner of an unimproved and unproductive lot of land situated on the south side of Vallejo street, between Leavenworth and Hyde streets, having a frontage of one hundred and thirty-seven and one-half feet, with a uniform depth of one hundred and thirty-seven and one-half feet, the assessed valuation of which was $4,175, for the fiscal year 1890-91, and $5,840 for the fiscal year 1900-01; also an undivided one-half interest in a lot of land, with the improvements thereon, situated on the southwest corner of Front and

Merchant streets, in said city and county of San Francisco, having a frontage of twenty-six and one-half feet on Front street, the assessed valuation of which was $5,685 for the fiscal year 1890-91, and $5,350 for the fiscal year 1900-01, the gross rental for which for the past twenty months has been and now is $50 per month; also lots 1 to 14, both inclusive, of Stratton survey in the city of Alameda, county of Alameda, state of California, of the assessed valuation of $50; the promissory note of the Pacific Improvement Company for the sum of $100,000; the sum of $14,152.21 in money, besides personal property, such as household and office furniture and jewelry, worth about $1,000; (7) of said property he gave to his daughter, Harriet G. Center, the real estate above mentioned situated on Front street and Vallejo street in said city and county, by deed dated December 8, 1892, and recorded on the same day; that on August 20, 1892, he gave to said Harriet G. Center $15,000 toward constructing and furnishing a house for her, and on December 31, 1892, the further sum of $5,000 for the completion of the same; (8) subsequent to September 12, 1890, and up to December 27, 1892, the gross income of decedent amounted to $27,400, consisting of $12,500 interest upon said $100,000, $2,700 rent of said Front street property, being at the rate of $100 per month, gross rental; $2,100 for services to General George W. Cullum, to wit, $100 per month up to and including May, 1892; $100 for services to Frederick Billings, and a legacy of $10,000 from the estate of Frederick Billings, deceased, on December 16, 1890; (9) from December 27, 1892, until his death, the gross income of decedent was $157,949.66, as follows: From the trustees of the estate of Frederick Billings, deceased, for services, the sum of $912.50, to wit: $100 each year, for the years 1893-98; $150 a year for the years 1899-1900, and $12.50 for the month of January, 1901; interest on said Pacific Improvement Company's note to September 25, 1897, $28,763.88; the principal of said note, $100,000 on September 25, 1897; interest of fifty $1,000 bonds of the Northern California Railway Company, and twenty-five $1,000 Contra Costa Water Company bonds, amounting to $9,375; besides the sum of $5,000, a legacy from the estate of George W. Cullum, deceased ($3,500 of which he received May 2, 1893, and $1,500 on May 2, 1894) ; the sum of $1,440.35

profit from the purchase of one thousand shares of Pacific Mail Steamship Company's stock on October 19, 1893, for $15,434.65, and the sale thereof on November 22, 1893, for $16,875, and $5,457.93 profit from the purchase of one thousand shares of Pacific Mail Steamship Company's stock on January 26, 1894, for $16,929.57, and the sale thereof on April 2, 1895, for $22,387.50; (10) on February 6, 1896, decedent purchased seventeen Los Angeles Light Company bonds for $17,170, and on February 11, 1896, gave the same to said Harriet G. Center, and on October 14, 1897, he purchased eight Los Angeles Light Company bonds for $8,020, and on October 16, 1897, gave the same to said Harriet G. Center; (11) on September 8, 1898, decedent purchased fifty $1,000 Northern California Railway bonds, bearing interest at five per cent per annum, payable semi-annually on December 1st and June 1st of each year, for $47,500, and between October 8 and October 18, 1898, he purchased twenty-five $1,000 Contra Costa Water Company bonds for $25,205, being the same bonds of which he died possessed and from which he received interest as hereinbefore stated; (12) on the twenty-fifth day of September, 1887, decedent deposited in his general account in the Bank of California, there being then a balance to his credit, $7,425, the sum of $101,500 derived from principal and interest of said Pacific Improvement Company note, and thereafter, between the said twenty-fifth day of September, 1897, and the nineteenth day of October, 1898, he had at all times more than said sum of $7,425.44 to his credit in said deposit; (13) on said twenty-fifth day of September, 1897, decedent was indebted to the trustees of Frederick Billings, deceased, in the sum of $1,203.97, and to the New York Cancer Hospital, in the sum of $479.94, moneys had and received by him for their use; (14) subsequent to the said twenty-fifth day of September, 1897, the only deposit in bank made by decedent was on the third day of December, 1900, upon which last-named date he deposited in the Bank of California the sum of $1,250; (15) from the twenty-fifth day of September, 1897, to the first day of December, 1898, the expenditures of decedent amounted to $5,754.74, in addition to those for the purchase of eight Los Angeles Light Company bonds for $8,020 on October 14, 1897, fifty

Northern California Railway bonds for $47,500 on September 8, 1898, fourteen Contra Costa Water Company bonds for $14,140 on October 8, 1898, and eighteen Contra Costa Water bonds for $18,135 on October 18, 1898, hereinbefore mentioned; (16) at the date of his death decedent had to his credit on deposit in the Bank of California the sum of $3,903.16; in his box in the vaults of the California Safe Deposit Company $3,990 in gold coin. of the United States, two certificates of deposit issued in his name by Wells, Fargo & Co.'s Bank, one for $1,550, dated January 14, 1898, and one for $1,250, dated December 2, 1898, besides $250 in gold coin at his residence in said city and county; (17) all of the property of said estate which came into the hands of said Harriet G. Center, as executrix aforesaid, is set forth in her final account herein, which was settled, approved and allowed by this court as presented, on April 11, 1902. The settlement of said account concluded neither party, as to the character of the property in the executrix's hands, as to whether or not it was the separate property of the decedent or the community property of the decedent and his second wife, nor whether it was or was not the community property of his first wife and himself; (18) said Elizabeth I. Granniss has received the bequests to her mentioned in the will of said decedent; (19) said decedent was engaged in no business from which he received any income except as hereinbefore set forth, to wit, from George W. Cullum and Frederick Billings, deceased; unless the purchase and sale of shares of Pacific Mail Steamship Company's stock herein mentioned be adjudged to be business.

### THE WILL AND CODICIL.

"I, George W. Granniss, of the City and County of San Francisco, State of California, do hereby make, publish and declare this my last Will and Testament. as follows, to wit:

"*First.* I give unto my wife Elizabeth Ingargiola Granniss the sum of Twenty thousand dollars ($20,000), together with all the household furniture and personal property now contained in the dwelling No. 19 Hawthorne street, San Francisco, with the exception that my daughter hereinafter mentioned may select and possess the portraits of her Grand-

father, Grandmother, her Father in his youth, and any and all of the pictures painted by her Mother.

"*Second.* I give unto my daughter Harriet Granniss Center all of the rest, residue and remainder of my estate, both real and personal, and wherever situated.

"*Third.* I hereby appoint my said daughter Harriet Granniss Center the Executrix of this Will without bonds.

"*Fourth.* I solemnly declare that all of my estate herein devised is my separate property, and was the community property of my first wife and myself.

"In Witness Whereof I have set my hand to foregoing will which is all in my own handwriting, this 8th day of January, 1894.

"GEO. W. GRANNISS.

"The foregoing · instrument, consisting of one page besides this, was, at the date thereof, by the said George W. Granniss signed and published as and declared to be his last Will and Testament, in presence of us, who at his request and in his presence, and in the presence of each other, have subscribed our names as witnesses thereto.

"HENRY H. REID, San Francisco, Cala.
"FRANCIS M. WARD, Alameda, Cal.

"To the Executrix of my Estate:

"It is my desire and direction, that all my jewelry, my watch, swords, canes and personal effects of that nature be given to my Grandson, Alexander Granniss Center, in the event of my death.

"G. W. GRANNISS.

"San Francisco, August 20, 1900."

In Le Breton v. Cook, 107 Cal. 416, the supreme court used language that may be appropriated to the facts and conditions of the case at bar, which has been argued by counsel with great learning and research, and with an abundance of authorities cited and reviewed on each side, and with regard to these citations we may repeat what was quoted from Rosenberg v. Frank, 58 Cal. 387, 411: "The case before us is one of interpreting the meaning of a written document, and decided cases afford but little aid in arriving at a correct interpretation. We hazard nothing in saying that this

is in accordance with the universal experience of gentlemen learned in the law, who have been frequently called on to employ their faculties in the solution of such questions. The good sense of what was said by Washington, J., in 1803, in Lambert's Lessee v. Paine, 3 Cranch, 131, will be generally acknowledged: 'Except for the establishment of general principles, very little aid can be procured from adjudged cases in the construction of wills. It seldom happens that two cases can be found precisely alike.' '' And the court then proceeds to say that ''the general principles which must control in the determination of the question here presented are well settled. Constructions which lead to intestacy, total or partial, are not favored; and, therefore, such an interpretation should, if reasonably possible, be placed upon the provisions of the will as will prevent that result. Especially should this be done where the will evinces an intention on the part of the testator to dispose of his whole estate. A devise or bequest of the 'residue' of the testator's property therefore passes all the property which he was entitled to devise or bequeath at the time of his death, not otherwise effectually devised or bequeathed by his will: Civ. Code, secs. 1332, 1333. Where, however, it is manifest from the context or from the provisions of the will that the testator used the word in some more restricted sense, it will be given the meaning in which it is clear that the testator used it.''

In this case the widow concedes that if the second clause of the will stood alone, there would be no controversy as to the nature and extent of the daughter's title; but she asserts that it does not stand alone, and does not contain any expressions which necessarily anticipate or limit any subsequent provisions affecting it (Colton v. Colton, 127 U. S. 300-302), for it is qualified and defined by the fourth clause, wherein the testator solemnly declares that all his estate therein devised was the community property of his first wife and himself.

The burden of the widow's contention stated by herself is that, although the second clause, considered independently of the other provisions, gives the daughter the title to the residuum of the estate, yet reading the second and fourth clauses together, it is clear that such residuum is of that part

of the testator's separate estate which *was* the community property of his first wife and himself.

In a New Jersey case—Miller v. Worrall, 48 Atl. 586—cited by the widow, Lord Mansfield's statement of the rule is recited that the intention of the testator is to be collected from all the parts of the will, and it must be clear, or else the heir at law shall not be disinherited.

As was said by this court in the Estate of Theresa Fair, decided November 19, 1892, it should seem unnecessary to quote the commonplaces of construction in this connection, as, for example, that the interpretation of a will must depend upon the intention of a testator, to be ascertained from a full view of everything contained within the "four corners" of the instrument; or, that all the parts of a will are to be construed in relation to each other, and so as, if possible, to form one consistent whole; or, that an intent inferable from the language of a particular clause may be qualified or changed by other portions of the will evincing a different intent, for the substance and intent, rather than words, are to control.

The intention of the testatrix is the first and great object of inquiry, and to this object technical rules to a certain extent are made subservient.

It is a cardinal rule of construction that effect must be given, if possible, to every part of a will.

There is, perhaps, no rule of construction of wider application to wills, or which oftener requires to be acted upon, than that every portion of the instrument must be made to have its just operation, unless there arises some invincible repugnance, or else some portion is absolutely unintelligible.

The general principles, discussed at length by respective counsel, are evident enough; the difficulty is, as remarked by our own supreme court, in applying them to a given case. The object of the inquiry of the court is the discovery of the intent of the testator, and its investigation must be limited to the language of the testament; when that end is attained, its duty is to execute that intent.

In the Estate of Young, 123 Cal. 337, upon which both counsel rely, this sentiment is syllabized in the statement that the courts have leaned to such construction of a will as

shall avoid intestacy; but such construction cannot be permitted where the terms of a will fail to make a legal devise; and if the legal effect of the expressed intent of the testator is intestacy, he must be presumed to have intended that result. The intention of the testator to be sought after is not that merely which existed in his mind, but that which is expressed in the language of the will.

Applying these familiar principles of construction to the case at bar, what do we discover in this document to manifest the intention of the testator? Did he intend to die intestate as to part of his property? Is his intention obvious to dispose of all his estate?

The daughter contends that having been named in the second clause as the residuary legatee, she is entitled to the whole estate after the payment of debts and specific legacies; but, says the widow, this contention, if approved by the court, would render nugatory the fourth clause, for the will in that event would be given exactly the same effect it would have had if the fourth clause had never been written. Why, then, did he write the fourth clause? Why, in so serious a matter, did he contrive this solemn declaration of the status of the estate therein devised.

It is the duty of the court to harmonize the various parts of the instrument, the rule being that all the parts shall be construed in relation to each other, so as, if possible, to form one consistent whole, but where several parts are absolutely irreconcilable, the latter should prevail as the latest expression of the testator's desire; still this rule is not to be resorted to except in cases where the repugnance is clear, so that one of the parts of the will must of necessity be rejected; for they are to be reconciled, if they possibly may be by reasonable construction.

Ordinarily the presumption is that the testator designed to dispose of his entire estate, and the instrument will be so construed, unless the contrary is clearly shown by its terms or by evidence, and it is laid down by the courts that any reasonable construction will be adopted so as to effect this presumed purpose; for it has been said, that the idea of anyone premeditating to die testate as to a portion of his property and intestate as to another is so unusual as to jus-

tify almost any construction to avoid it; and no such intention will be imputed when the language can fairly be construed otherwise, for wills are to be liberally construed so as to effectuate the intention of the testator, and it is the duty of courts to search for a construction that will carry it into effect.

It is true that this search should not seek the secret workings of the mind of the testator, and that, as was said in the state supreme court in the Estate of Young, it is not what he meant, but what his words mean, but it is also true, as has been said by the United States supreme court, that in the construction of wills it may be doubted if there be any source of instruction superior to the application of natural reasoning to the terms of the instrument, under the light which may be thrown upon the intent of the testator by the circumstances of its execution and connecting the parties and the property devised with the testator and with the instrument.

What the circumstances in this case were may be seen by an examination of the stipulated statement of facts prefaced to this opinion. I am satisfied that the conclusion of the supreme court in the Cudworth case could be applied with equal force to these facts and circumstances, and that what the testator had in mind there was very much the same as here in respect to the declaration made as to the character of his property.

It may well be doubted whether decedent left any property which was the community of himself and his second wife. In the nineteenth and last paragraph of the stipulation it was agreed that he was engaged in no business from which he received any income except as thereinbefore set forth, namely, from George W. Cullum and Frederick Billings in their lifetime and from the estate of Frederick Billings, deceased, unless the purchase and sale of shares of P. M. S. S. Co.'s stock herein mentioned be adjudged to be business.

The widow claims that by the terms of the stipulation there is an admission on the part of the daughter that there was community property of the second marriage, in this, that decedent earned the sum of $912.50 and made profits upon two speculations in stock of the steamship company, one of

$1,440.35, and the other of $5,457.93, and it is maintained by the widow that these sums were the result of his exercise of his business ability in which she had a community interest, and were not mere profits upon his separate estate, even though it had been shown that such estate only was invested; and she insists that there is no proof that some part of his admitted earnings did not enter into the first speculation and no evidence as to what part of the profits of that speculation was community and what part separate property, and, therefore, the whole profit must be deemed community.

In support of this proposition, the widow cites, among other cases, Lewis v. Lewis, 18 Cal. 654, which citation her adversary asserts is no authority, as the law was changed shortly after the decision in that case, to which assertion the widow replies that this court is not advised of any legislative act altering the law of community property in California, and certainly it has been held uniformly by our supreme court that the burden is upon the contestant to prove by clear and convincing evidence that property acquired during marriage is separate.

In view of this controversy, it may be worth while to have recourse to a monograph by the late Professor Pomeroy in the West Coast Reporter, volume 4, pages 194, 195, in which he undertakes to comment on the case cited:

In Lewis v. Lewis, 18 Cal. 654, the husband married in 1854, then possessed of separate property in cattle, horses and money to the amount of $20,000. He died in 1859 possessing cattle, horses and money valued at $40,000. His sole business at his marriage and down to the time of his death was that of dealing in such stock. Of the stock owned by him at the time of his death, a portion, worth about $4,000, consisted of certain cattle ·which he owned when married; the remainder consisted of the increase of stock owned at the time of his marriage, and of other stock bought with the proceeds of the sale of his original stock, or with the proceeds of the sale of the other stock by which the original stock had been replaced. The court held, as the deceased was engaged in no other business, the fair inference was that the community property was the difference between the original value of the property owned by him at his marriage and the

value of the property possessed by him at the time of his death, after deducting the amount of the community debts. In other words, all the increase made upon his separate property as capital was declared to be community property.

This increase was held to be community property, because under a statute, existing at that time, "all the rents, issues and profits" of separate property were declared to become community property. But this provision of the statute itself had been unconstitutional and void, so far as it affected the "rents, issues and profits" of the wife's separate estate, as early as the case of George v. Ransom. If the decision in the case of Lewis v. Lewis is based upon the notion that the rents, issues and profits of the husband's separate estate became community property, under the then existing statute, it certainly would not be law under the code, which expressly declares that the "rents, issues and profits" of the husband's separate estate continue to be his separate property.

In the Cudworth case counsel for appellant, the son, commenting on Lewis v. Lewis, said that it was decided under the statute of 1850, which made the rents, issues and profits of separate property community, which statute was declared unconstitutional by the supreme court, and our laws were accordingly changed to confer the rents, issues and profits of separate property upon its owner: See Supreme Court Records, volume 2172, pages 207, 208. The change in the law came with the codes. The law as it now stands is to be found in the constitution, article 20, section 8, which provides that all property, real and personal, owned by either husband or wife before marriage and that acquired by either of them afterward by gift, devise or descent, shall be their separate property. This was in substance, so far as it goes, the old article 11, section 14, of the constitution of 1849, dealt with by Mr. Justice Baldwin in George v. Ransom, in construing the act of 1850, regulating the relation of husband and wife.

Section 163 of the Civil Code furnishes the appropriate legislation that all property owned by the husband ·before marriage and that acquired after by gift, bequest, devise or descent, with the rents, issues and profits thereof, is his separate property, and section 687 of the same code provides that community property is property acquired by husband

and wife, or either, during marriage, when not acquired as the separate property of either.

Decedent's will is short and simple in form: First, he gives to his wife $20,000, together with all the household furniture and other personal property in their dwelling, excepting certain family portraits and pictures to be selected by his daughter. Second, he gives to his daughter all of the rest, residue and remainder of his estate, both real and personal, and wherever situated. Fourth, he solemnly declares that all his estate therein devised *is* his separate property and *was* the community property of his first wife and himself.

This document was dated January 8, 1894, and was republished in legal effect by the codicil of date August 20, 1900.

Reading the will as a whole, it is clear to my mind that he intended to limit the share of the widow to the legacy specified in the first paragraph, and that in writing the second paragraph he designed to donate all the residue of his estate to his daughter, making her executrix, without bonds, in the third paragraph, and in the fourth he undertook to give his conception of the character of his entire estate. Whatever the fact might be, his idea was at the date of the will and of the codicil that the entire estate devised or disposed of or given to the persons named was his separate property and the product of the community property of his first wife and himself, and it does not seem to me that this is a strained or artificial interpretation of his language, but a sensible construction of its import and effect, without any ingenious conjecture whether the testator meant more or not.

This court does not think decedent intended to die intestate as to any part of his property, and does think that his intention is obvious to dispose of his entire estate.

In conclusion it seems to me that the final words of Judge Andrews in the Lamb case may apply here: "We have been impressed in this case with the difficulty which often attends the search for the intention of a testator. Many of the rules which courts have adopted as guides in ascertaining the intention of testators assume such intention from words and phrases, where often it is very doubtful whether they were used with any intelligent application of the legal meaning

given to them. But these rules have become, in many cases, rules of property, and work out in the majority of instances results as nearly just as may be. It is better to adhere to them in their integrity than to permit exceptions upon slight grounds. The rule that in the interpretation of wills, residuary clauses are to be given a broad rather than a narrow interpretation, has a stronger foundation in natural reason than have some of the other rules adopted by courts.''

In the case at bar this court is of the opinion that there is not found in the will so clear an indication that the testator intended a restricted meaning to the residuary clause as to justify its limitation in the manner contended for by the widow.

The prayer of the daughter is granted.

---

The Case of Estate of Grannis was before the supreme court of California in 142 Cal. 1, 75 Pac. 324.