[S. F. No. 7049. In Bank.—December 13, 1915.]

In the Matter of the Estate of JULIUS FRIEDMAN, Deceased. HEBREW HOME FOR AGED DISABLED et al., Respondents, v. LIEBE FRIEDMAN et al., Respondents; EDWARD J. LYNCH, Administrator, etc., et al., Appellants.

ESTATE OF DECEASED PERSON—DISQUALIFICATION OF JUDGE—PREJUDICE AND BIAS.—An application, under section 170 of the Code of Civil Procedure, to disqualify the judge before whom this matter was pending on account of his prejudice and bias manifested in prior proceedings had before him, is held to have been properly denied.

APPEAL from an order of the Superior Court of the City and County of San Francisco, refusing an application for a transfer of all the matters and proceedings in the estate of a deceased person to another department of the Superior Court. Thomas F. Graham, Judge.

The facts are stated in the opinion of the court.

Houghton & Houghton, and Sullivan & Sullivan and Theo. J. Roche, for Appellant.

Charles W. Slack, for Respondent, Hebrew Home for Aged Disabled.

Marshall B. Woodworth, for Respondent, Edward R. Lande, Executor.

Edmund Tauszky, for Respondent, I. M. Friedberg, Executor.

D. Friedenrich, Edgar D. Peixotto, Marcus Rosenthal, H. I. Kowalsky, A. A. Sanderson, Cullinan & Hickey, and Chickering & Gregory, for other Respondents.

HENSHAW, J.—In the probate court of the city and county of San Francisco, Honorable Thomas F. Graham presiding, and in the matter of the estate of Julius Friedman, deceased, application was made under section 170 of the Code of Civil Procedure, for a transfer of all the matters and proceedings in said estate to another department of the superior court. The motion was denied and from the order denying it this appeal is taken.

Julius Friedman died testate in 1900 and his will was duly admitted to probate. The inventory value of his estate in that year was four hundred and sixty-six thousand dollars, and it has since enhanced in value. The will was holographic. It declared that the testator knew of no relatives who could lay claim to any portion of his estate. It left bequests to friends to the amount of thirty thousand dollars, a trust fund for the poor of his native city, Mitau, in the sum of fifty thousand dollars, other bequests aggregating twenty thousand dollars to named orphan asylums and charitable institutions in San Francisco, and finally directed that "the entire residue so found shall go and be given to the within mentioned society, Hebrew Home for Aged Disabled of San Francisco, Cal., as an additional donation by me given towards the support of the within mentioned to be reincorporated Hebrew Hospital and Home Association for Aged Disabled of California. They (the executors) are then directed to close up my estate by delivering all the balance of the property remaining in their hands belonging to me, real, personal and mixed, in trust to the society named Hebrew Home for Aged Disabled of San Francisco, California. Present value to be, say, about two hundred thousand dollars more or less which I hereby give, bequeath and devise unto the Board of Directors of said society to be received and employed by said Board of Directors for the following trust and purpose:

"The said Board of Directors shall receive said property in trust for said society, in its name, and from me as a fund by me given for the benefit of said society and to be used by it for the sole purpose of building a hospital and suitable

home, namely, said Board of Directors shall set apart the sum of $150,000 and designate the same as 'hospital fund,' and the $50,000 remaining out of said above mentioned $200,000 shall be designated as 'home fund,' and shall take about $10,000 from each fund for the purpose of purchasing say from about twenty to thirty acres of land at either the outside limits of this city, or at San Mateo, Alameda or Marin County, in this state.

"The said Board of Directors shall then erect on said land a hospital building with all modern, sanitary improvements, equipped and furnished with about fifty beds.

"The Board of Directors of said Hebrew Home for Aged Disabled are also directed to dispose of their small property on Lombard Street in this city, occupied and known as said Home, and erect on said land a suitable Home for said society.

"It is my wish that the said Board of Directors of said Hebrew Home for Aged Disabled of San Francisco, California, shall liquidate all said corporation may then be owing and apply to court for the dissolution of said corporation and immediately thereafter reincorporate under the name and style of Hebrew Hospital and Home Association for Aged Disabled of California. It is my will that I. M. Friedberg and Edward R. Lande join as members of said Society (being two of my executors), and be placed as directors of the building and financial committee, and serve, if possible, until said buildings are finished and ready for occupancy, they knowing my wish how it should be built."

If, in fact, the deceased did leave heirs at law, his will would be invalid as to two-thirds of his estate, which would descend to those heirs. (Civ. Code, sec. 1313.) The residuary legatee in 1901 instituted the special proceeding, contemplated by section 1664 of the Code of Civil Procedure, to determine heirship to this estate. Claimants to a number exceeding three hundred came forward, asserting heirship. They appeared from all quarters of the globe. Depositions were taken, their claims investigated, and the major portion of them were eliminated from consideration. There were left five sets of claimants, known as the Kagan claimants, the Grunwaldt claimants, the Bernstein claimants, the Liebe Friedman claimants, and the Jacobson claimants. The matters connected with the administration of this estate came successively before different judges in probate. In January,

1907, Judge Graham began to preside over the probate department in which this administration was pending, and has continued so to preside ever since. The calamity of April, 1906, destroyed the voluminous records of this estate and vast labor was spent and much time consumed in the restoration of these records, which was finally accomplished several years thereafter by the attorneys for the executors. In December, 1909, the Hebrew Home for Aged Disabled filed a petition for partial distribution. All other bequests, charitable and personal, had been paid. About ten years had elapsed since Friedman's death. The petitioner had received none of the fruits of his bounty, and it asked that there be distributed to it less than one-third of the residue of his estate—the amount which under the law the testator was entitled to bequeath and the charitable institution entitled to receive, even if the testator left heirs. Before this application was made the trial of the special proceeding under section 1664, Code of Civil Procedure, had commenced. Certain demurrers were interposed to this petition for partial distribution. Incomplete hearings were had in this matter during the spring and autumn of 1910. The demurrers of Houghton & Houghton, representing the Kagan claimants, and of Marshall Woodworth, representing the executor, Lande, presented a legal question touching the construction of the will, the contention being that the Hebrew Home for Aged Disabled was not by the will made the direct recipient of the testator's bounty, but was merely a beneficiary of a trust created by the will, that the will contained a direct bequest of the residuum to the trustees of the Hebrew Home, who alone were entitled to take, and that consequently the Hebrew Home, as a petitioner for direct distribution to itself, had no standing in court. These demurrers were overruled. No one questioned but that the Hebrew Home, either directly or through its trustees, was entitled to the partial distribution which it sought, and as it had for ten years been denied enjoyment of property bequeathed for its benefit, strong reason appeared why this distribution should be ordered. Certain minor differences of opinion arose as to the character of property which should be distributed, whether it should be all in money, or a part in money, a part in land, and the remainder in personal securities of various kinds. The court having declared its intention to make the decree, there seems

to have been a general expression of a desire upon the part of the rival claimants to heirship (as expressed by one of their attorneys) ''that every charity which was named or referred to in the will of Julius Friedman should have and receive of his property all that they would be entitled to receive under the laws of the state of California had the provisions of the will been good and sufficient.'' Judge Graham then directed the attorneys for the Home to prepare a form of decree, and suggested that the attorneys of the claimants of the Home and of the executors confer, and, if possible, agree upon the form of the decree. The matter came up for hearing upon September 27, 1910. A decree had been prepared, a stipulation to be signed by the various attorneys and counsel consenting to it had also been drawn, and the proposed decree and stipulation was handed to Mr. Woodworth, attorney for Executor Lande, for consideration and action. All of Houghton & Houghton's clients and claimants (appellants herein) assented to the decree saving one, and as to him it was announced that he would not appeal. These facts were made known to the court by Judge Slack, appearing as attorney for the Hebrew Home, and Judge Slack further informed the court that he understood that Mr. Woodworth, representing Mr. Lande, intended to interpose an objection to the decree. The records of the court then disclose the following:

''Mr. Woodworth: Appearing on behalf of Mr. Lande—

''The Court: (Interrupting.) I want to instruct you right now, Mr. Woodworth, that you should not appeal from this order.

''Mr. Woodworth: It is a very serious matter, your Honor.

''The Court: I want to see these people get this money.

''Mr. Woodworth: The position we take is that the proper party is not before the court; and, in the second place, they are not following out the terms of the will; and we propose to present these matters, with due deference to your Honor's opinion in the matter; and it is a very serious matter, paying out $100,000. Who agrees to this—the five sets of claimants; but we are the ones to pay it out.

''The Court: They are all agreeing to it because the court suggested that they should agree to it. . . .

''This matter has been duly threshed out in this department, and I have held that they are entitled to receive this

money. I don't know whether I have any power to stay the hand of the executors from taking an appeal in this matter.

"Mr. Woodworth: If your Honor has that power, we yield to your Honor's decision. . . .

"The Court: I want to make this order, and I want to see these old people get the benefit of some of this money, as Colonel Kowalsky says, and right away, too. . . .

"Mr. Woodworth: I think it is my right, Mr. Wise, and I therefore offer the last will and testament of Julius Friedman and the probate proceedings as the same appear of record in the restored records, and I also desire to offer at this time the articles of incorporation.

"The Court: Mr. Lande, do you approve of this stand that Mr. Woodworth has taken?

"Mr. Lande: I feel so much impressed by what your Honor has said that I am constrained to take away my former position, and to say that so far as I am concerned, executor and individual, I will right now here in court sign a stipulation consenting to the integrity and virtue of this decree and its permanency—its finality; in other words, notwithstanding there may be a grave doubt about the right of this corporation to receive this magnificent gift as a corporate entity—notwithstanding there may be legal problems involved, I am willing to assume the chance and carry out the wishes of this court. . . .

"Mr. Wise: I want to suggest to your Honor, in view of the attitude taken by Mr. Lande, even in face of the suggestions of his own attorney, that certain objections which Judge Slack and I as attorneys for the Hebrew Home for Aged Disabled, were called upon to file against the account lastly submitted, that I would propose, in compliment to Mr. Lande's position, that your Honor permit Judge Slack and myself to withdraw from the files of this court the objections against the settlement of the accounts presented by him; that they be destroyed. I would also suggest that the same thing be done with the objections made against the executor, Mr. Friedberg. . . .

"The Court: I hope the aged Hebrews will have a chance to use some of this money within a short time.

"Mr. Slack: We appreciate your Honor's position."

We have felt constrained to quote the record thus at length because it is principally upon this record that the disquali-

fication of Judge Graham is predicated. But, to proceed with the narrative of facts. It will be remembered that at and during this time the trial of the special proceeding under section 1664 was in progress. That trial continued at intervals before the court until Judge Graham rendered his decision on December 14, 1912, denying all of the asserted rights of the claimants to heirship. In May, 1913, Messrs. Houghton & Houghton served and filed their notice of intention on the part of the Kagan claimants to move for a new trial in this special proceeding, and on July 3d following filed a lengthy affidavit, sworn to by one of the Kagan claimants, in which was charged irregular conduct evidencing prejudice and bias upon the part of Judge Graham against the Kagan claimants and in favor of the Hebrew Home on the hearing of the petition of the Home for partial distribution on September 27, 1910, the record of which has already been quoted. The affidavit declares that by reason of this bias and prejudice the Kagan claimants were prevented from having a fair and impartial trial in the separate proceeding to determine heirship. After the filing of this affidavit Messrs. Houghton & Houghton proposed a bill of exceptions on behalf of the Kagan claimants on their motion for a new trial and this bill of exceptions was settled before Judge Graham and filed upon April 11, 1914. On April 30, 1914, the attorneys for the Kagan claimants agreed in open court that the motion for new trial should be set for hearing on May 15, 1914, and it was so set for hearing by Judge Graham. On May 19, 1914, another affidavit, sworn to by the same Kagan claimant, was filed. This affidavit made reference to his earlier affidavit on file and sought for the first time to disqualify Judge Graham from hearing the motion for a new trial upon the ground of the prejudice and bias shown at the hearing on September 27, 1910, and on the further ground that Judge Graham had given advice to Mr. Lande on matters involved in the proceeding for a new trial. Still further, Judge Graham was charged with an irregularity in the matter of the trial of the special proceeding to determine heirship growing out of the request of Mr. Houghton, that if Judge Graham should decide to sign the findings as they are "before any findings are signed by your Honor, I ask that we have the benefit of the decree served upon us

so we may have it for five days at least before your Honor signs the findings.

"Mr. Slack: The decree will simply follow the findings.

"The Court: I will see that you get it."

The irregularity lies in the asserted fact that the findings were signed and filed without any notice to the attorneys of the Kagan claimants. Still further as an irregularity it was charged that the findings and decree had been signed when the court had no power to sign them, by reason of the fact that one of the defendants represented by Houghton & Houghton had died before the findings were signed and filed or the decree signed and filed. Complaint is made that upon the application of Edward T. Houghton upon the suggestion of the death of Elke Cohen and the presentation of an order appointing him special administrator of her estate to be substituted in the proceedings in the place of Elke Cohen, deceased, the judge, instead of granting the order *ex parte*, continued the matter until 2 o'clock of the afternoon of the same day, to permit the appearance of the attorneys for the Hebrew Home in the consideration of the matter. It is shown that discussion was had as to the proper practice; that the court suggested that counsel would consent to a *nunc pro tunc* order; that objection was made to this, argument was had, and the court said: "I want to cut this argument short—I want to suggest to counsel here that unless they consent that this be entered prior to the signing of the findings, I will not permit any changes; the supreme court will have to say that I must do it." And, finally, charges of improper conduct upon the part of the attorneys for the Hebrew Home and of Mr. Woodworth, attorney for Executor Lande, in the argument of these various matters were made. These charges are here adverted to only for the purpose of showing that they have not been overlooked. They do not merit and will not receive detailed consideration, and it is quite sufficient in disposing of this branch of the inquiry to say that the improprieties charged are found in the language of the record above quoted, and that by no possible legitimate inference from that record can any asserted misconduct of the attorneys form the basis of any charge of bias and partiality on the part of the judge. To all of these charges counter-affidavits by the judge and by others in explicit denial were filed. A thousand pages of printed argument have been pre-

sented to the court upon the one proposition here involved, and yet we think the controversy susceptible of complete determination in but a few pages of discussion.

And upon this consideration we are relieved from the sometimes difficult and always disagreeable duty of deciding between conflicting statements of fact; for here the bias and prejudice of the judge, if shown at all, is shown by the record of the proceedings in his own court. It is shown without conflict or controversy over the facts. And amongst those facts meriting remembrance are the long delay of the years that had elapsed during which the Hebrew Home had received nothing of the generous provision which the testator had made for it; the fact that by the decree of partial distribution no one of the rival claimants to heirship was surrendering one penny of what would come to him if his heirship was established; that more than three years and a half elapsed after Judge Graham's asserted bias and prejudice was established by the record, and no complaint of any kind by anybody was made of it—no protest nor objection at the time nor thereafter. There was no objection nor attempt at amotion or recusation of the judge, though the record was before the attorneys of all of the claimants. No objection to Judge Graham was suggested even when the trial to determine heirship was thereafter resumed; nor yet after it was decided, nor when the bill of exceptions was settled and the motion for new trial had been set down for hearing. And, finally, it is pertinent to observe that of all the contestants, only the Kagan claimants find in the utterances of Judge Graham, expressed more than three years before in a quite independent proceeding, in no sense involving any of the property or the rights of the claimants, any ground of complaint.

We will not here pause to consider whether the failure to protest or object, and the long delay in presenting their motion until after the determination of the litigation in which the appellants here were vitally interested, worked a waiver of their right to be heard upon the motion. Certain it is that the ethics of the profession forbid, if the law does not, that one under such circumstances shall be allowed "to speculate upon what rulings the court will make upon propositions involved in the case, and if the rulings do not happen to be in his favor, to then for the first time raise the jurisdictional

question." (*State ex rel. Lefebvre* v. *Clifford,* 65 Wash. 313, [118 Pac. 40].)   But we decline to enter into this considera- tion because it affords both an unnecessary and unsatis- factory determination of  this question.   The waiver of a right presupposes the existence of a right lost.   To hold merely that the appellants have lost their right to cause a transfer of their case to be had because of the bias and preju- dice of a judge intimates, if it does not concede, that such bias and prejudice exist, and it must always be the least satisfactory method of disposing of such a controversy, both to litigants and to the judge.   Wherefore, the consideration of the question of waiver is not here desirable.   Nor yet is it necessary, for we are clear in the view that no disqualification is shown by the record before us.

What, then, precisely did Judge Graham do and say at the hearing of September 27th?   He had decreed that the Hebrew Home should take under its petition for partial dis- tribution.   He had expressed his earnest desire that the Home and its aged inmates should enter into the enjoyment of the testator's bounty, which enjoyment had so long been withheld from them.   He told Executor Lande that he should not appeal from the decree.   He said more than this.   He declared that if it were in his power he would prevent him from taking such an appeal.   Manifestly, this attitude and these remarks (and they constitute the "head and front" of Judge Graham's offending) could not possibly give evidence of any bias and prejudice against the Kagan claimants.   Not only were their property rights not involved in the considera- tion before the court, but they had assented to the decree which the court had made and had aided through their coun- sel in the preparation of its form.   The sole antagonism which the court showed, therefore, was to the position of Executor Lande, who proposed to appeal from this decree, and by the appeal perhaps for a still longer period keep the Hebrew Home out of its enjoyment of the testator's beneficence. This is the utmost that the appeal could have effected, be- cause it is not questioned, and cannot be questioned, but that either the Home directly was entitled to distribution, or the Home indirectly was entitled to distribution through it trus- tees.   In either case the property would be received by this charitable institution, subject to all the valid trusts and ·conditions which the testator might have imposed, and as the

Home itself, like every other corporation, could only receive and could only act through its directors or trustees, a distribution direct to the Home under the trusts and conditions of the will, or a distribution to the trustees of the Home for the Home under the terms and conditions of the will, would present legal differences absolutely inconsequential. Again, there can be no question as to the right of the Hebrew Home to petition the court in probate for partial distribution. Admittedly it had the right as residuary legatee, but equally did it have the right if it were the beneficiary of a legacy left in trust for it. (Civ. Code, sec. 863; *In re Mackay,* 107 Cal. 303, [40 Pac. 558].) And there is much authority of weight to the effect that a devise or bequest to the trustees or directors of a charitable institution is a devise or bequest to the institution itself. (*New York Institute for the Blind* v. *How's Exrs.,* 10 N. Y. 84; *Short* v. *Wilson,* 13 Johns. (N. Y.) 33, 38; *Morgan* v. *Durand,* 51 Misc. Rep. 523, [101 N. Y. Supp. 1002]; *In re Durand,* 56 Misc. Rep. 235, [107 N. Y. Supp. 393]; *Santa Cruz* v. *Southern Pac. R. R. Co.,* 163 Cal. 538, 542, [126 Pac. 362.].)

And finally in this connection it may be added that as none of the rights of the executor was involved in the decree of partial distribution, and that as no liability could attach to him for a compliance with the decree, it was a matter at least of grave doubt whether he had any right whatsoever to appeal from it. (*Bates* v. *Ryberg,* 40 Cal. 463; *Estate of Wright,* 49 Cal. 550; *Rosenberg* v. *Frank,* 58 Cal. 387; *Estate of Marrey,* 65 Cal. 287, [3 Pac. 896]; *Goldtree* v. *Thompson,* 83 Cal. 420, [23 Pac. 383]; *In re Welch,* 106 Cal. 427, [39 Pac. 805]; *Estate of Williams,* 122 Cal. 76, [54 Pac. 386]; *Estate of Murphy,* 145 Cal. 464, [78 Pac. 960]; *Estate of Young,* 149 Cal. 173, [85 Pac. 145].) The judge in probate with this law and these cases in mind might well be pardoned for viewing with impatience the proposed action of Executor Lande in taking an appeal, which appeal, in the court's judgment, would operate only to keep the Hebrew Home out of funds to which it was justly entitled and from the enjoyment of which, for one cause or another, it had been deprived for years, and which appeal would meet with a dismissal for lack of interest in the party appealing when it came under the consideration of a higher tribunal.

To sum up, then, in the matter of the decree of partial distribution upon a question in no way involving heirship or the rights to any property which any of the heirs might claim, and in the matter of the decree of partial distribution to which appellants had assented and in the preparation of which their counsel had aided, the judge in probate gave expression to the most natural wish that the beneficiary, admittedly entitled to the moneys arising under this decree of partial distribution, should receive those moneys as promptly as possible. Neither by the facts nor by any reasonable inference drawn from the facts can this record be distorted into any utterance displaying bias or prejudice against the Kagan claimants, nor any bias or prejudice in favor of the Hebrew Home other than as has been said—the expression of a natural desire of the court that that Home should as soon as possible enjoy the money which admittedly belonged to it. The dissatisfaction or impatience, or both, which the court displayed was from no possible view directed against the attitude of the Kagan claimants or any other of the claimants, but solely against what the court conceived to be the unduly litigious and procrastinating policy proposed to be adopted by one of the executors.

And that brings us to the second consideration urged upon our attention in many pages of the briefs. Objections to the accounts of two of the executors of the estate were pending hearing, the charges being based upon the assertion, supported by some evidence already taken, that the executors had shared in the fees awarded their attorneys. We have not before us any finding upon this matter which makes these charges the subject here of review. But in argument it is said that the fact that these charges were hanging over the head of Executor Lande, who alone stood in opposition to the proposed form of the decree of distribution, was used by the attorneys for the Hebrew Home and by the judge to coerce the executor into abandoning his objections to the form of the decree and his proposed appeal from it. The evidence from which it is said this inference should be drawn is found in the fact that the court interrupted Mr. Woodworth, attorney for Executor Lande, and asked the executor directly whether he supported Mr. Woodworth in the position which Mr. Woodworth was taking; and further, from the fact that after Mr. Lande's remarks to the court in which he an-

nounced that he would abandon the idea of appealing, the attorneys for the Home moved the court that they be permitted to withdraw these objections to Mr. Lande's account. It is said that the judge himself is shown to have been a party to and in connivance with this plan because he interrupted the attorney and addressed his question over the attorney's head to the executor. Forthright denial of the charge thus imputed is made in the affidavits of everyone implicated in it. In view of the court's effort to bring all of the parties together in consent as to the form of the decree of distribution; in view of the fact that all but Mr. Lande and his attorney had consented; in view of the further fact that Mr. Lande himself was an attorney at law, it was indeed a natural inquiry of the court to ask the executor, as he did, whether he still maintained his former determination to appeal. The right to determine whether or not an appeal should be taken rested with the executor who, as we have said, was himself an attorney. In his efforts to adjust this matter (to which we repeat the appellant here had consented) without further delay, not only was the court's inquiry natural, but certainly could not be distorted into any expression of bias or prejudice against the Kagan claimants. And indeed throughout the argument upon these various matters this court, in effect, is asked to draw most strained inferences of evil from a record which, dispassionately viewed, gives evidence of nothing but fair dealing and a desire to dispose of the business of an estate long in probate without further unnecessary delay.

In like manner we are asked to draw the same unwarranted inference of evil upon the charge of disqualification based upon the assertion that Judge Graham gave advice to Mr. Lande "upon matters involved in the action or proceeding for a new trial now pending before said court." No fact is herein stated, but as to the fact touching the motion for new trial in the proceedings to determine heirship it is made to appear that the judge did what most judges do and what every judge may with propriety do—confer with the attorneys as to the form of the findings and decree after judgment pronounced. As to the advice given in the proceeding for distribution, that advice as appears from the record is found in the following language: "I instruct you right now, Mr. Woodworth, that you should not appeal from this order." If a remark such as this shall disqualify a judge upon the

hearing or trial, then must he suffer disqualification from any direction or suggestion which he may make to the attorneys at his bar. ''This cross-examination has proceeded far enough''; ''You need not pursue this line of inquiry further''; ''You may amend your complaint to pass demurrer by an added allegation to the following effect''; these and innumerable other remarks, each and all eminently proper in themselves, would, under counsel's view, disqualify a judge. We cannot believe that further exposition of this matter is either necessary or desirable.

It is charged as an irregularity that the findings and decree in the proceeding to determine heirship were signed and filed after the attention of the court had been called to the fact that the defendant Elke Cohen, one of the Kagan claimants, had died, and that no person had been appointed executor of her estate. How such a mere irregularity or error in the course of a trial can be construed into evidence of prejudice and bias is not at all apparent. But even the facts are in conflict with the statement. Elke Cohen had died; her attorneys knew of her death; they did not advise the court of that death until after the findings and decree had been signed and filed, and then for the first time urged upon the court its irregularity in so doing. Then it was that they asked *ex parte* for an order substituting the special administrator of her estate, and then it was that the court set down that application for hearing. The judicial harassments which accompanied this bitter litigation are plain to be seen from the record. Equally plain was it to the judge that another complication had arisen in the matter of the filing of the findings and decree, which complication was due to the secrecy of Elke Cohen's attorneys. While not necessary, it was quite natural that under the circumstances he should have set the application for hearing to avoid the possibility of further difficulties and complications arising out of the situation. If it be a fact that the judge agreed that the attorneys for the appellants should have a copy of the findings and decree five days before they were signed and filed—a matter which is not clearly established in the record—any reasonable view to take of the court's failure in this regard would charge that failure to mere inadvertence and not to some malign design to thwart the Kagan claimants in any of their rights, when

as matter of fact and law the court's oversight could not even have tended to thwart them.

We have said that the charges of improper conduct on the part of the attorneys do not merit any animadversion, nor do they, but once more we are asked to draw the inference that in some way through them the bias and prejudice of the judge is shown. One of these is the statement of Mr. Woodworth in argument upon the trial of heirship, to the effect that the judgment of the court should be against the claimants and in favor of the Hebrew Home. It is said that this is inconsistent with his position that the trustees of the Hebrew Home, and not of the Hebrew Home itself, were entitled to petition and take under the distribution, and that therefore the Hebrew Home was not a party properly before the court. But what, in fact, does the language fairly show? The Hebrew Home was before the court under its ruling. It was Mr. Woodworth's duty on the trial to submit to that ruling. His contention simply was that the claims to heirship should be held to be false, unfounded and unproven, and that the judgment of the court should therefore be in favor of the Hebrew Home. It is beyond the bounds of our comprehension to discern the slightest impropriety in this. And the same is true of the prejudicial language asserted to have been used by the attorneys for the Hebrew Home upon the hearing for distribution. It amounts, and under any reasonable view can amount, to nothing more than the views of counsel upon the legal questions involved in the determination. With the soundness of those views we are, of course, not here concerned, but as in every litigation involving questions of law there must be a divergence of views or there would be no litigation, this court is now asked to hold that an attorney who presses his views of the law upon the attention of the court, even if those views prove to be mistaken, shall be held to be endeavoring unduly to influence the court and to create in the court's mind a condition of bias and prejudice against his adversary.

Thus we have reviewed, perhaps with undue detail and discussion, the separate contentions of appellants touching the bias and prejudice of the judge. It can never be an agreeable duty for a judge himself to pass upon this question, but it is a duty the performance of which our law imposes on him. It is both expected and presumed that he can and will

perform that duty with impartiality. (*Hoyt* v. *Zumwalt*, 149 Cal. 381, [86 Pac. 600].) It is as much his duty to retain a case in which he is not disqualified as to transfer a case in which he is disqualified. (*Heinlen* v. *Heilbron*, 97 Cal. 101, [31 Pac. 838]; *Swan* v. *Talbot*, 152 Cal. 142, [17 L. R. A. (N. S.) 1066, 94 Pac. 238].) Wherever an honest doubt may be thought to exist, we believe the profession need have no fear but that the trial judge will with alacrity resolve that doubt in favor of the moving party. No judge desires to sit in a cause where his fairness is questioned. Where it is seriously questioned he, more than any, will desire that the transfer be made, because he, better than any, knows that while it is of first importance that the source of justice be fair and impartial, it is of secondary importance only that by the litigants before him it should be believed to be fair and impartial. But in the case before us not only the long delay in preferring the charge, but the foundations of the charge itself are so unsubstantial, that it would have been a failure of duty on the part of the judge to have made any other order than that which is here presented for review.

The order appealed from is therefore affirmed.

Melvin, J., Sloss, J., Lorigan, J., and Angellotti, C. J., concurred.

SHAW, J., Concurring.—This is an appeal from an order refusing to transfer all proceedings in the aforesaid estate to another department of the superior court.

The motion to transfer the proceedings was based on the alleged prejudice and bias of Honorable Thomas F. Graham, before whom said proceedings were then pending. The essential facts relied on in support of the motion are as follows:

The administration of the estate has been proceeding in the superior court of San Francisco from the year 1900 down to the present time. The will of the decedent, which was duly probated, gave the residue of the estate to a charitable corporation known as the Hebrew Home for Aged Disabled of San Francisco, California. In 1901 that corporation instituted a proceeding, under section 1664 of the Code of Civil Procedure, to determine to whom distribution should be made and the interest and estate of each person declared to be entitled. Many different sets or groups of persons appeared

therein claiming heirship, among, them appellants herein, This proceeding is still pending, and had so far advanced that judgment that the testator left no heirs had been entered in the superior court and a motion for a new trial of that proceeding had been made by the appellants here. Judge Graham was about to proceed to hear the motion when this application by the appellants to transfer all the proceedings to another department was interposed.

This and all other proceedings in the administration were transferred in 1907, to Department 10 of the superior court, over which Judge Graham presides, and he has, ever since that time, presided at all the proceedings taken. In December, 1909, the said Hebrew Home filed a petition, under sections 1658 to 1662 of the Code of Civil Procedure for a partial distribution of its residue, alleging that the total value of such residue was then about seven hundred and fifty thousand dollars, and asking distribution of two hundred thousand dollars thereof. This, it will be observed, was less than one-third of the estate, and the donee would be entitled to it as a donee for a charitable purpose, even if some of the appellants are eventually adjudged to be heirs. The appellants appeared in opposition but were not successful, and a decree of partial distribution to said petitioner of property appraised at one hundred and fourteen thousand five hundred dollars was made on September 6, 1910, in pursuance of said petition and of a stipulation signed by all the parties present, including the appellants, in which all of them waived all right to move for a new trial or to appeal therefrom.

The facts relied on as proof of bias and prejudice consist for the most part of what it is alleged he said and did while presiding as judge at the proceeding for partial distribution. They are: 1. That he instructed the attorney for the executors that they should not appeal from the order of partial distribution, saying that he wanted to see the aged Hebrews get the benefit of the money right away. 2. That he made said distribution, erroneously as appellants claim, to the corporation aforesaid instead of to the directors thereof personally in trust for the corporation. 3. That he suggested to the parties appearing that they all agree to the order as made. 4. That during the hearings he several times interrupted counsel for appellants in the conduct of the case. 5. That on the settlement of the findings in the proceeding

to determine heirship he said to the attorneys for appellants that he would see that they got a copy of the findings five days before they were signed, but that in fact he signed said findings two days afterward and without notice to appellants or their attorneys. 6. That he signed the findings prepared by the plaintiff in that proceeding and refused to allow or sign any finding proposed by the executors, and that he refused to hear further argument in regard to postdating the file-marks on the findings.

The affidavits in support of the motion are met by an affidavit of Judge Graham explicitly denying any bias or prejudice, and declaring that in all his statements, rulings, and actions in these matters he was actuated solely by a desire to do justice.

The charge of bias and prejudice scarcely deserves serious consideration even if there were no denial. The appellants were not injured by the partial distribution. It was less than one-third of the estate, and the charitable bequest would be good to that extent against them as heirs in any event. The only point urged was that it should have been made to the directors instead of the corporation. As due notice had been given, the directors would be bound by the decree, and the estate was fully protected against any claim they might afterward make to the same property. The instruction to the executors not to appeal was proper. There is nothing to indicate that the judge did not honestly believe that the corporation was the donee of the residue, not the directors. We must, therefore, presume that he did. The making of the partial distribution was so obviously right that the judge was fully justified in suggesting that all should agree to it. No improper motive is charged with respect to the failure of the judge to keep his promise to give the appellants' attorneys the findings five days before they were signed. Even if bias were not denied, the only fair inference would be that such failure was a mere inadvertence. The court is itself responsible for the findings. (Code Civ. Proc., sec. 632.) At the time these findings were filed the statute did not require the judge to allow the attorneys for the parties to examine the findings before they were filed. There was nothing irregular in the proceeding, nor is it alleged that the mere form of the findings was in any wise prejudicial to the appellants.

For these reasons I am of the opinion that both the motion and the appeal are without merit, and I concur in the judgment of affirmance.

Lawlor, J., concurred.